No. 23-3013

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

FENG "FRANKLIN" TAO,

*Defendant-Appellant.*

———————————————

On Appeal from the United States District Court
for the District of Kansas
No. 2:19-CR-20052 (Hon. Julie A. Robinson)

———————————————

## REPLY BRIEF FOR DEFENDANT–APPELLANT
## FENG "FRANKLIN" TAO

Oral Argument Requested

———————————————

PETER R. ZEIDENBERG
MICHAEL F. DEARINGTON*
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6000

*Counsel for Feng
"Franklin" Tao*

May 24, 2023

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................1

I.    The government's brief confirms that the evidence was insufficient to convict Dr. Tao of making a false statement under 18 U.S.C. § 1001(a)(2). ..............................................................................1

    A.    The KU Institutional Responsibilities form was not a matter within DOE or NSF jurisdiction.............................................1

        1.    The government's reliance on cases involving false statements in fraudulent applications for federal benefits is misplaced. ......................................................2

        2.    The government mischaracterizes the allegations and evidence in arguing that Dr. Tao made a false statement "in his ongoing federally funded research." .............................6

    B.    Dr. Tao's alleged statements in the Institutional Responsibilities form were correct, or at a minimum not objectively false. .................8

        1.    The District Court was correct that Dr. Tao lacked a Significant Financial Interest. ....................................................8

        2.    Dr. Tao lacked an external Time Commitment as of September 25, 2018. ...........................................................11

        3.    The false-certification theory fails because it was not alleged in Count 9 or argued at trial, and Dr. Tao never certified the form..................................................................13

    C.    The alleged omissions were not material to an agency decision, and the government never even identified an agency decision to which they could have been material. .................................14

    D.    Dr. Tao did not make an affirmative false statement as required by § 1001(a)(2)..................................................................18

II.    The false statement conviction violates the Due Process Clause's fair warning requirement..............................................................19

III.    The Paperwork Reduction Act bars the conviction......................................21

## TABLE OF CONTENTS
(continued)

Page

IV.   The government fails to rebut Dr. Tao's alternative arguments in support of a new trial. ....................................................................23

    A.   The conviction resulted from two constructive amendments of the indictment, each of which was a fatal variance that requires reversal or a new trial. ......................................................................23

    B.   The District Court failed to instruct the jury about two of Dr. Tao's main defenses. ...................................................................24

CONCLUSION ...................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ciminelli v. United States*,
    2023 WL 3356526, 598 U.S. --- (May 11, 2023) ............................14, 15, 24, 25

*McCormick v. United States*,
    500 U.S. 257 (1991) ....................................................................................14

*Navajo Nation v. Dalley*,
    896 F.3d 1196 (10th Cir. 2018) ................................................................18

*United States v. Blankenship*,
    382 F.3d 1110 (11th Cir. 2004) ...........................................................3, 5, 6

*United States v. Celis*,
    128 F. App'x 819 (2d Cir. 2005) ..............................................................18

*United States v. Dick*,
    744 F.2d 546 (7th Cir. 1984) ....................................................................17

*United States v. Hardman*,
    297 F.3d 1116 (10th Cir. 2002) ................................................................22

*United States v. Irwin*,
    654 F.2d 671 (10th Cir. 1981) ..................................................................18

*United States v. Jackson*,
    608 F.3d 193 (4th Cir. 2010) ......................................................................4

*United States v. Jones*,
    44 F.3d 860 (10th Cir. 1995) ....................................................................10

*United States v. Meuli*,
    8 F.3d 1481 (10th Cir. 1991) ..............................................................4, 5, 17

*United States v. Osborne*,
    886 F.3d 604 (6th Cir. 2018) ....................................................................10

*United States v. Rodgers*,
466 U.S. 475 (1984).........................................................................1, 8

*United States v. Ross*,
77 F.3d 1525 (7th Cir. 1996) ...................................................17

*United States v. Sasser*,
974 F.2d 1544 (10th Cir. 1992) ................................................22

*United States v. Schulte*,
741 F.3d 1141 (10th Cir. 2014) ................................................10

*United States v. Smith*,
866 F.2d 1092 (9th Cir. 1989) ..................................................22

*United States v. Williams*,
934 F.3d 1122 (10th Cir. 2019) ................................................14

*United States v. Wolf*,
645 F.2d 23 (10th Cir. 1981) .......................................2, 3, 4, 17

*United States v. Wright*,
988 F.2d 1036 (10th Cir. 1993) ................................................17

**Statutes**

18 U.S.C. § 2.........................................................................23

18 U.S.C. § 1001(a)(2).......................................................1, 18

44 U.S.C. § 3502(3)(A)..........................................................22

44 U.S.C. § 3512(b) ...............................................................21

**Other Authorities**

2 C.F.R. § 200.112 ...............................................................6, 7

H.R. Rep. 104-680 ...................................................................18

## INTRODUCTION

In its opposition brief, the government fails to cite any case that has endorsed its unprecedented false statement theory. The government does not dispute that the alleged false statement was made exclusively to KU in a form the federal agencies lacked authority to access, belying jurisdiction, and it does not defend the District Court's erroneous basis for finding NSF jurisdiction. Nor does it dispute that the prosecutors below never identified an agency decision to which the false statement was material. Nor does it identify any evidence that Dr. Tao had a conflict of interest with an agency-funded grant. It also does not dispute that, during closing, the prosecutor baselessly argued that Dr. Tao *caused KU* to make a false statement to the agencies, a fatal variance from the indictment. For these reasons, and the other reasons identified below, reversal is required.

## ARGUMENT

I.   **The government's brief confirms that the evidence was insufficient to convict Dr. Tao of making a false statement under 18 U.S.C. § 1001(a)(2).**

A.   **The KU Institutional Responsibilities form was not a matter within DOE or NSF jurisdiction.**

The government does not dispute that a false statement must be made within a matter "confided to the authority of" NSF or DOE to violate § 1001, *United States v. Rodgers*, 466 U.S. 475, 479 (1984), yet it provides no explanation how DOE or NSF had "the power to exercise authority" over KU Institutional Responsibilities

1

forms that they could not even access and of which they were unaware. *See* Tao Br. 25–32.[1] Instead, the government strains to make two arguments in an attempt to bring the alleged statements within agency jurisdiction, each of which is meritless.

> 1. <u>The government's reliance on cases involving false statements in fraudulent applications for federal benefits is misplaced.</u>

The government attempts to shoehorn this case into the category of cases holding that there is jurisdiction where a defendant makes a false statement to a non-federal entity in applications for undeserved federal benefits, based on *United States v. Wolf*, 645 F.2d 23, 25 (10th Cir. 1981). This attempt is meritless.

As an initial matter, *Wolf* does not hold that any false statement to a non-federal entity that "concerned federal requirements," Gov't Br. 39, is within a funding agency's jurisdiction. The government bases this argument on a single sentence from *Wolf*, which it quotes three times, in which the court observed that "[i]t is well settled that the false statement need not be made directly to a federal agency to sustain a section 1001 conviction as long as federal funds are involved." Gov't Br. 1, 24, 39 (quoting *Wolf*, 645 F.2d at 25). But *Wolf* did not hold that *all*

---

[1] By failing to make the argument, the government implicitly concedes that the District Court erred in finding that NSF had jurisdiction over Dr. Tao's statements in the KU form based on the NSF PAPPG policy. *See* Tao Br. 29–32.

statements made to a non-federal entity that receives federal funding are within an agency's jurisdiction. The government's argument is a syllogistic fallacy.[2]

To the contrary, *Wolf* described the limited circumstances when this principle applies:

> In each instance where the issue arose in the cited cases there was directly concerned a regulatory or contractual scheme in which the federal government acted as a supervisor of disbursement or was to reimburse the defrauded non-federal agency. **The false statement is typically made on an application for benefits and submitted to a state agency or private party. The federal government there either partially funds the program under which the undeserved benefits are requested or reimburses the agency for its expenditures. The funds fraudulently received thus come in effect from the United States.**

*Wolf*, 645 F.2d at 25 (emphasis added); *see id.* ("Section 1001 is basically a provision directed to statements to obtain federal funds or direct governmental benefits."). Thus, "jurisdiction does not simply follow federal money wherever it may lead," *United States v. Blankenship*, 382 F.3d 1110, 1138 (11th Cir. 2004), or encompass statements that purportedly "concerned federal requirements," Gov't Br. 39.[3] Rather, under the cases cited in *Wolf*, the false statement must be in an application for undeserved federal benefits or other moneys.

---

[2] The government's theory, if adopted, would also violate the Due Process Clause's fair warning requirement. *See* Tao Br. 38–40.

[3] Notably, the alleged false statements here also did not even "concern[] federal requirements," only Dr. Tao's external financial interests and time commitments.

Here, in contrast, Dr. Tao's alleged statement about his external financial interests or time commitments was not part of an "an application for … undeserved benefits" that the defendant "fraudulently receive[s]." *Wolf*, 645 F.2d at 25. Nor did Dr. Tao attempt to defraud DOE or NSF through the September 25, 2018 KU form (or otherwise). Dr. Tao was acquitted of all fraud charges, and it is undisputed that there was no evidence of improper grant expenditures, JA-V3-544, and that Dr. Tao performed all grant work to the agencies' satisfaction, Tao Br. 17–19. Thus, the line of cases cited in *Wolf* has no currency here.

The government's reliance on *United States v. Jackson*, 608 F.3d 193, 197 (4th Cir. 2010), is also misplaced. There, the Fourth Circuit held that the NSA had jurisdiction over falsified timesheets the defendant submitted to his employer, a defense contractor, while working on site at the NSA, resulting in invoices to NSA and "the expenditure of NSA funds" amounting to "approximately $75,150 for unperformed work." *Id.* at 194–96. The NSA had jurisdiction because it had authority "not to pay a false invoice," which was "an official, authorized function of the executive branch." *Id.* at 198. *Jackson* stands in stark contrast with this case, where Dr. Tao's KU form did not fraudulently seek agency funds, and he completed all grant work satisfactorily. *See* Tao Br. 17–19.

The government's reliance on *United States v. Meuli*, 8 F.3d 1481 (10th Cir. 1991), fares no better. There, the defendant "made the false statements on official

IRS 1099 forms," which he submitted to banks as part of a scheme to obtain a $1,000,000 IRS refund, and which advised the banks to submit the information to the IRS. *Id.* at 1483, 1485. This made it "not only reasonably foreseeable, but inevitable, that the recipient would contact the IRS concerning these false statements." *Id.* at 1485. Moreover, the court held that the false statements were *material*, and never addressed the *jurisdiction* element, likely because the defendant made the statements in official IRS forms, with intent that the forms be submitted to the IRS, as part of a scheme to obtain IRS funds. *Id. Meuli* is inapposite.[4]

This case is more analogous to *Blankenship*, where the Eleventh Circuit held that the Department of Transportation lacked jurisdiction over a defendant's false statement to a government contractor about compliance with payment conditions. 382 F.3d at 1139. The court held: "Generally speaking, a federal agency only has the authority to take action against the recipient of the federal funds—that is, the party with whom it has contracted." *Id.* at 1137. Like in *Blankenship*, DOE and NSF contracted only with KU, not with individuals who worked for KU like Dr. Tao. JA-V4-854. This case is even further afield of agency jurisdiction than *Blankenship*,

---

[4] Contrary to the government's argument, Gov't Br. 24, *Meuli* fits into *both* of the two categories of cases where courts have found agency jurisdiction over a false statement made to a non-federal entity, because it involved a fraudulent scheme to obtain federal funds and to obstruct a statutory scheme that IRS was tasked with enforcing. It also involved a classical false statement theory, because the defendant attempted to cause the banks to submit his false statement *to the agency*.

because Dr. Tao did not falsely certify compliance with a condition of contract payment or disbursement of federal funds.

2. <u>The government mischaracterizes the allegations and evidence in arguing that Dr. Tao made a false statement "in his ongoing federally funded research."</u>

The government also tries to bring the alleged false statements within DOE and NSF jurisdiction by asserting that "[t]he matter in which Tao made his false statement [was] his ongoing federally funded research … over which the agencies had authority." Gov't Br. 43.[5] To the contrary, Count 9 charged Dr. Tao with making a false statement in an internal KU form about his external financial interests and time commitments. JA-V1-50.

The government's reliance on an OMB regulation to contrive agency jurisdiction over the KU form also fails. *See* Gov't Br. 4, 39, 47 (citing 2 C.F.R. § 200.112). The government acknowledges that it successfully objected to the introduction of the regulation on "relevance" grounds, Gov't Br. 39 & n.9, and therefore cannot rely on it on appeal. Nor did the regulation require KU to collect information from employees about external financial interests or time commitments;

---

[5] The government's argument that § 1001 requires agency jurisdiction over the "matter" in which the statement was made, and not over the statement itself, is flawed. Gov't Br. 42–43. A statement in a matter within agency jurisdiction *is* a statement within agency jurisdiction. In any event, neither the alleged false statements nor the KU form in which they were made were within NSF or DOE jurisdiction.

it required only that the "Federal awarding agency must establish conflict of interest policies for Federal awards" and that the grant recipient "disclose in writing any potential conflict of interest to the Federal awarding agency … *in accordance with applicable Federal awarding agency policy*." 2 C.F.R. § 200.112 (emphasis added). There is no dispute that KU complied with the regulation. DOE lacked a policy on this topic, JA-V13-2733–819, and NSF's policy required KU to disclose only unmanageable *financial* conflicts of interest worth $10,000 or more that conflicted with a *grant*, JA-V14-3072–73 (*e.g.*, Keiser's example of a researcher receiving funding from a tobacco company to research the lungs, *see* Tao Br. 16), which did not exist here.[6]

The government's reliance on Keiser's and Schwartz's testimony is misplaced. *See* Gov't Br. 43. Keiser testified that it would be "concerning" if a *proposal* for funding from NSF omitted "conflicts" of interest, JA-V5-960, but Count 9 does not charge a misrepresentation in a proposal. And the only potential conflict with which NSF was concerned was a financial conflict of interest with an NSF grant, which Dr. Tao did not have. *See* Tao Br. 29–32; JA-V14-3072–73. Similarly, Schwartz testified that DOE examines the PI's time commitments in the

---

[6] The government baldly asserts that Dr. Tao "falsely represented … that he had no conflicts of … interest," but it merely parrots the indictment and fails to provide any supporting evidence or argument. Gov't Br. 27 (quoting JA-V1-50). The government therefore waived the argument below and again on appeal.

Current and Pending Support section of the *grant proposal* to see if the PI has time to complete the research. JA-V6-1184. But Count 9 did not charge a false statement in a DOE grant proposal, and Dr. Tao was acquitted by the jury on the false statement count related to his alleged omission of Current and Pending Support from DOE.[7]

\* \* \* \* \*

Accordingly, the Court should reject the government's invitation to chart new territories of agency jurisdiction unrecognized by Congress, *Rodgers*, or any other court decision.

### B.   Dr. Tao's alleged statements in the Institutional Responsibilities form were correct, or at a minimum not objectively false.

The government argues that Dr. Tao made three objectively false statements in his Institutional Responsibilities form. Gov't Br. 27–35. Each argument fails.

>   1.   <u>The District Court was correct that Dr. Tao lacked a Significant Financial Interest.</u>

The government's argument that Dr. Tao omitted a "Significant Financial Interest" from the KU form on September 25, 2018, ignores the uncontradicted testimony of the FBI forensic examiner that there was no evidence that FZU paid

---

[7] Count 10 charged Dr. Tao with omitting the alleged second job from his Current and Pending Support in an email to DOE in July 2018. The government ignores that the jury acquitted him of this charge. *See* Gov't Br. 12–13 ("[I]n July 2018, he falsely told DOE the same thing."). It also misstates that "Tao falsely told NSF" about his Current and Pending Support in May 2018, Gov't Br. 12, when in fact a UCLA professor (the PI) provided this information to NSF (Gov't Exs. 143 & 144), and it was not false. Dr. Tao was also acquitted of defrauding NSF.

Dr. Tao any money. JA-V9-1949–50, 1955. It also overlooks the testimony of the FBI case agent that Dr. Tao's alleged activities at FZU may have been for "no pay and no time commitment" and done "on a trial basis," without ever signing a contract with FZU. JA-V11-2452–53.

The government cannot overcome this evidentiary void by *speculating* that Dr. Tao *might have* signed an employment agreement with FZU in May 2018, under which he *might* have been paid $5,000 or more between then and September 25, 2018. Gov't Br. 29–30.[8]

The government's speculation is particularly baseless given that the FBI found "no signed contract between [Dr. Tao] and Fuzhou," JA-V11-2345, 2355, 2375, despite the draft agreement's requirement that Dr. Tao keep a copy, JA-V10-2210, coupled with the fact that the FBI searched and seized all of Dr. Tao's email accounts, electronic devices, and physical files and papers, but found only unsigned

---

[8] The government bases its speculation that there was a signed contract on an FZU official's request that Dr. Tao sign the contract when he visits China, but omits that Dr. Tao responded that he could just "send it" if he decides to sign, JA-V15-3399— something he did not agree to do. It also cites its expert's opinion that Dr. Tao likely signed a contract, but the same expert later testified that it was "inconceivable" that FZU would enter into an agreement under which Dr. Tao would continue to work at KU and not perform the central requirements in the agreement such as by not teaching any classes at FZU—when, in fact, Dr. Tao continued to work at KU and did not teach any classes at FZU. Tao Br. 15.

drafts.[9] This speculation also clashes with the undisputed fact that Dr. Tao did not perform the central requirements in the draft agreement, *see* Tao Br. 14–15, and the absence of *any* payments from FZU to Dr. Tao in his US and Chinese bank accounts.[10] Most important, a conviction cannot be based on "speculation and conjecture," or by "piling inference on inference." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995).

Moreover, even if the government had proved that Dr. Tao received salary from FZU, his alleged nondisclosure still was not objectively false, because the disclosure criteria were fundamentally ambiguous (subject to de novo review) and arguably ambiguous (subject to sufficiency review). *See* Tao Br. 33–34; *United States v. Schulte*, 741 F.3d 1141, 1150 (10th Cir. 2014).[11] The government claims that there is no evidence that the phrase "related to your University Responsibilities" is ambiguous. Gov't Br. 32. Not so. It is undisputed that the KU form provided no

---

[9] The government cites *United States v. Osborne*, 886 F.3d 604, 613 (6th Cir. 2018), to justify its reliance on an agreement that does not exist, Gov't Br. 31. But unlike here, there was no dispute in *Osborne* that a contract existed, even if the government did not obtain and introduce it.

[10] While the government acknowledges that Dr. Tao's Chinese bankbook showed no payments from FZU, it falsely asserts that he "had at least one other Chinese bank account," Gov't Br. 31, citing testimony that a picture of a Chinese debit card was found on Dr. Tao's KU computer, which did not even bear his name. JA-V7-1507. In fact, there was no evidence that the debit card was Dr. Tao's or that anyone made payments into the unidentified account.

[11] The government is wrong in asserting, without explanation, that Dr. Tao asserts only arguable and not fundamental ambiguity. Gov't Br. 32.

explanation for this phrase, KU policies and witnesses provided no guidance about the meaning of this criteria, JA-V2-321, and KU failed to provide required training about the disclosure criteria. Tao Br. 8 & n.6.

The ordinary meaning of "related" also strongly indicates that alleged salary from FZU was not "related" to Dr. Tao's teaching or research at KU.[12] A reasonable construction of the phrase, in light of its purported purpose of identifying financial conflicts of interest, is that it applies in situations implicating a potential conflict, such as where a professor outsources university lab tests to a company in which he or she is an owner—not where the professor is alleged to have a second job.

2. Dr. Tao lacked an external Time Commitment as of September 25, 2018.

Dr. Tao also lacked a reportable external Time Commitment, and the government's rank speculation about the existence of a signed contract does not demonstrate otherwise. *See supra* § I.B.1. The government's assertion that Dr. Tao worked fulltime at FZU also misstates the evidence. For example, the government does not dispute that Dr. Tao never taught classes at FZU and that he maintained his

---

[12] *See* Related, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/related (last visited May 16, 2023) (defining "related" to mean "connected by reason of an established or discoverable relation").

full-time employment at KU while he somehow allegedly also worked full-time at FZU.[13]

That Dr. Tao spent 81 days of the spring 2019 semester (when he had a buyout and could work remotely) and two months of summer 2019 in China, JA-V15-3255-56, where his extended family resides, and at a time when his mother was ill, JA-V12-2585, does not demonstrate that he had an external time commitment at FZU, let alone that one existed on September 25, 2018—a semester he was teaching full-time at KU. To the contrary, the government has never disputed that Dr. Tao worked remotely for KU in spring and summer 2019, closely supervised KU research, JA-V9-1912–13, JA-V11-2351–53, excelled at his federally funded research, Tao Br. 17–19, and that the agencies permitted him to work on the grants from abroad, JA-V6-1198, JA-V5-1064–65, JA-V4-778. Remote work for KU does not constitute a time commitment at another university.

---

[13] Contrary to the government's brief, Dr. Tao's lab student obtained only price "quotes," and purchased no equipment for FZU, JA-V9-1908–09; the presentation purportedly showing pictures of Dr. Tao's lab at FZU does not identify them as such, JA-V14-3167, 3188–90; evidence of the lab team Dr. Tao sought to "assemble" involved failed overtures to postdocs, JA-V10-2134–35, 2138; the purported evidence that Dr. Tao "perform[ed] research" at FZU is hearsay from an unsigned, draft Chinese grant proposal of unknown authorship full of factual errors, including that Dr. Tao worked fulltime in China beginning in 2017, JA-V15-3227; and Dr. Tao's purported assignment of a mentee by FZU is dated March 2018, months before he allegedly even signed an agreement to join FZU, JA-V10-2014–15.

The Time Commitment disclosure criteria—namely, whether an external activity "take[s] time away" from KU responsibilities—was also fundamentally and arguably ambiguous. The government has never attempted to explain what this phrase meant.[14] The most plausible definition is that the activity must interfere with the individual's KU responsibilities and, applying this standard, Dr. Tao had nothing to disclose. The FBI case agent testified that Dr. Tao "was performing his job duties at KU," JA-V11-2342—testimony that went uncontradicted—and in April 2019, one year after Dr. Tao allegedly began working full-time at FZU, he was awarded KU's Scholarly Achievement Award, one of KU's highest honors. Tao Br. 15.

### 3. The false-certification theory fails because it was not alleged in Count 9 or argued at trial, and Dr. Tao never certified the form.

The government's false-certification theory, Gov't Br. 22, 28, 35, fails because the indictment did not allege the certification as a false statement. The government points only to an allegation *eleven pages* earlier in the indictment that merely references the certification—but that does not even contend that it was *false* or that it was within NSF or DOE jurisdiction. *See id.* at 55 (citing JA-V1-39). Nor did the government argue this theory at trial. *See* JA-V12-2621.

---

[14] The government at most seeks to define a *conflict* of time, and in doing so introduces a new fundamentally ambiguous concept—whether the activity "exceed[s] *reasonable* time limits." Gov't Br. 29 (emphasis added).

The government also cannot rely on this new theory because "'[a]ppellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.'" *Ciminelli v. United States*, 2023 WL 3356526, at *5, 598 U.S. --- (May 11, 2023) (quoting *McCormick v. United States*, 500 U.S. 257, 270–71 n.8 (1991)). The government cannot "cherry-pick facts presented to a jury," *id.*, which it did not argue at trial or in its post-trial briefing, and it is wrong in stating that the court can affirm on "any basis supported by the record," Gov't Br. 46 n.11.

The government also fails to rebut that Dr. Tao never certified the KU form charged in Count 9. *See* Tao Br. 38 & n.20, 45. The testimony it highlights, Gov't Br. 13 n.2, confirms this: "I know that you have to check that box again as sort of a check of your work so that you don't accidentally hit submit without making sure that you really want to. So you actually have to click that little box or it doesn't submit." JA-V2-444–45. The KU form charged in Count 9, unlike the 2015 form, includes no certification with a check-marked box.

**C.    The alleged omissions were not material to an agency decision, and the government never even identified an agency decision to which they could have been material.**

The government agrees that it must identify "[w]hat decision was the decision maker considering" and then prove that the statement was "capable of influencing the relevant decision." Gov't Br. 45 (quoting *United States v. Williams*, 934 F.3d

14

1122, 1128 (10th Cir. 2019)). Yet the government *does not dispute* that it failed at trial, and in post-trial briefing below, to satisfy the threshold requirement that it identify an agency decision to which Dr. Tao's alleged false statement was material. Tao Br. 36. This concession requires reversal.[15] And as noted above, the government is wrong in arguing that the Court "may affirm on any basis supported by the record." Gov't Br. 46; *see Ciminelli*, 2023 WL 3356526, at *5.

Even if the Court could consider the government's argument—raised for the first time on appeal—that Dr. Tao's alleged nondisclosures were material to agency decisions "to fund or to continue funding Tao's research," Gov't Br. 45–46, 48, that argument is also meritless. KU never submitted a proposal for agency funding after Dr. Tao allegedly made the false statement on September 25, 2018. Thus, even if the KU form could have somehow impacted the contents of a funding proposal, it would be impossible for it to have done so here. The agencies also would not have based a decision to "continue funding" on the KU form. If anything, the agencies used annual progress reports to confirm that funding should continue, JA-V5-1165–66, but no one from the KU Research Office was involved in preparing the progress reports, JA-V4-772, JA-V5-1067-68, let alone using the KU form. The progress reports also

---

[15] That the District Court "identified *another* way in which" the form could be material in that "NSF and DOE relied on KU to manage conflicts," Gov't Br. 48 (citing JA-V1-233), is of no help because the government did not argue this below and, in any event, that argument *still* does not identify an agency decision.

related specifically to grant work—without any questions requiring disclosure of an alleged second job at FZU. *E.g.*, JA-V5-1074, JA-V6-1295.

The government's reliance on testimony from Keiser and Schwartz about *grant proposal* disclosure requirements provides no help. *See* Gov't Br. 45–46. Keiser's testimony was in reference to disclosures in an NSF grant *proposal*, and thus is irrelevant to the allegation in Count 9. *Id.* In addition, her statement that "NSF would say that needs to be reported to us," JA-V5-1135, was in response to a hypothetical researcher who applied for funding in China and worked fulltime there—neither of which occurred here. *Id.* As for Schwartz, the government misattributes the prosecutor's question to her in erroneously asserting that she "wanted to know whether [Tao] was receiving research support from a foreign university." Gov't Br. 46 (quoting JA-V6-1188). Schwartz did not accept the premise of the question and testified: "I would have liked to know all forms of *research grants*." JA-V6-1187–88. But there was no evidence that Dr. Tao had research grants in China. *E.g.*, JA-V10-2151. In addition, Schwartz's testimony related to disclosures in DOE grant *proposals*, which was not at issue in Count 9. *Id.* And, as noted above, KU did not submit any proposals for NSF or DOE funding after Dr. Tao made the alleged false statement on September 25, 2018. These defects explain why the trial prosecutors made no attempt to identify an agency decision to which the alleged false statements in the KU form could be material.

16

None of the cases cited by the government support its materiality arguments, as each involved false statements that the agency relied upon in making a decision. *See Wolf*, 645 F.2d at 24 (false certification forwarded "to DOE which in turn based its 'entitlement' program on these reports" and "depended on the accuracy and truth of such certificates"); *Meuli*, 8 F.3d at 1485 (false statement on official IRS form to be forwarded by banks to IRS, making it "not only reasonably foreseeable, but inevitable, that the recipient would contact the IRS concerning these false statements"); *United States v. Wright*, 988 F.2d 1036, 1036, 1039 (10th Cir. 1993) (not addressing materiality, but where false statement was in a monthly report required by the Safe Drinking Water Act, which the EPA "inspect[s]" to enforce the Act); *United States v. Ross*, 77 F.3d 1525, 1545 (7th Cir. 1996) (false statement to an accreditor whose decision the Department of Education would rely on in making funding decision); *United States v. Dick*, 744 F.2d 546, 553–54 (7th Cir. 1984) (false statement to sureties that would be forwarded to the Small Business Administration, influencing SBA guarantee decisions).[16]

---

[16] The alleged false statements in the KU form were not material merely because DOE and NSF suspended the grants less than a week after Dr. Tao was *indicted*. Gov't Br. 49. This conflates the materiality of the alleged nondisclosures with the materiality of the indictment. JA-V3-0530. Unsurprisingly, the agencies suspended funding of Dr. Tao's research while he was on administrative leave from KU and charged with multiple felonies.

### D. Dr. Tao did not make an affirmative false statement as required by § 1001(a)(2).

The government's argument that Dr. Tao's alleged *omissions* charged in Count 9 violate 18 U.S.C. § 1001(a)(2) ignores the text and history of the statute. Section 1001(a)(2), unlike § 1001(a)(1), does not criminalize *omissions*. In enacting the False Statements Accountability Act of 1996, Congress amended the prior version of the statute that established a single offense and replaced it with one that created "three separate but related offenses." H.R. Rep. 104-680, at 8, 1996 U.S.C.C.A.N. 3935, 3942. Whereas § 1001(a)(1) criminalizes certain material omissions, § 1001(a)(2) criminalizes only the *making* of affirmative materially false *statements*. To hold otherwise would ignore the plain language of § 1001(a)(2) and the intent of Congress, and it would improperly render § 1001(a)(1) surplusage. *See, e.g.*, *Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018). *United States v. Irwin*, 654 F.2d 671, 676 (10th Cir. 1981), and *United States v. Celis*, 128 F. App'x 819, 820 (2d Cir. 2005), do not hold otherwise, and both involve a false certification, which was not charged or proven here. *See supra* § I.B.3.[17]

---

[17] The District Court and the government adopted the new false-certification theory for the first time after trial as a response to this very argument.

**II.    The false statement conviction violates the Due Process Clause's fair warning requirement.**

The government does not dispute that a person of common intelligence would be unaware that omitting information about external financial interests and time commitments from an internal employee form is a federal felony offense. Tao Br. 38–40. Nor does it dispute that, if the court upholds the conviction here, anyone who makes a misrepresentation to an employer, or in a university admission application, could be charged with a felony false statement, merely because the employer or university receives federal funds. The government provides *no* limiting principle that would prevent § 1001 from criminalizing mundane misrepresentations, such as a public school teacher who takes a sick day to visit a relative or take care of a child.

Instead, the government ignores the broader implications of the expansive precedent it desires, and argues that Dr. Tao himself acted willfully. Gov't Br. 23. But the government conflates Dr. Tao's alleged efforts to avoid telling KU about the job offer or even his alleged acceptance of a second job with awareness that doing so could constitute a federal offense. *Id.* at 35–36.[18]

---

[18] The government cites a conversation between Dr. Tao and another KU professor who said it "legally" should not be a problem if Dr. Tao spent three months at another institution if the contract stated that time commitment, Gov't Br. 10, but this was in the context of a discussion about KU "policy," JA-V15-3356—not a recognition that an omission from the KU form could be a federal crime. JA-V15-3357. And even "in terms of policy," when the KU professor said "there would be trouble" if Dr. Tao was overcommitted, Dr. Tao responded, "Right, I don't want it that way." JA-V15-

The government also points to four instances when other defendants, mostly of Chinese descent, pled guilty to crimes, Gov't Br. 36–37, all of which *post-dated* Dr. Tao's indictment and thus do not detract from the novelty of the charges against him, and could not have provided him with fair warning, and which are easily distinguishable from Count 9. Three cases (*Zheng*, *Ang*, and *Lookman*) involved false statements made directly to federal agencies, and one case (*Lu*) involved a guilty plea to wire fraud, and thus did not even involve the same offense. All four involved materially different conduct than Count 9 alleges. And the cases all involved guilty pleas—not court decisions upholding their theories.

The government's attempt to show that Dr. Tao discussed prosecutions with allegations similar to Count 9 also rings hollow. Gov't Br. 10–11, 23. All five examples involved drastically different allegations: (i) a defendant who submitted fraudulent reimbursement request to NSF and pocketed hundreds of thousands of dollars (whom Dr. Tao criticized), JA-V15-3337–38; (ii) a defendant who was sued civilly but was exonerated, JA-V15-3339; (iii) a defendant who worked for the US government and had a twelve-month commitment but lied directly to the government about a secret job he worked at instead, JA-V15-3336–37; (iv) a defendant who defrauded NSF of funds, JA-V14-3138; and (v) two professors investigated *by their*

---

3355. It is fanciful to believe that, had Dr. Tao believed he was committing a felony, he would have discussed the matter with a KU colleague.

*university* (a fact the government misleadingly omits) for failing to disclose research funding in China, JA-V15-3413. The only commonality these cases have with this one is that the defendants, like Dr. Tao, were ethnically Chinese.

The government's failure to marshal a single § 1001 case even remotely similar to this one in the past 140 years since Congress enacted the earliest version of the statute confirms that Count 9 is truly unprecedented and without fair warning.

## III.    The Paperwork Reduction Act bars the conviction.

The government makes two arguments in an effort to sidestep the Paperwork Reduction Act, each of which is unpersuasive. First, the government argues that Dr. Tao waived this argument by not raising it below. To the contrary, as the government recognizes, the District Court denied Dr. Tao's request that it instruct the jury about this defense. Gov't Br. 50; *see* JA-V12-2501. This preserved the issue for appeal. It would have been futile for Dr. Tao to reassert the defense in his motion for judgment of acquittal and argue that a rational jury would have acquitted him based on the defense, since the jury was not even instructed about it. The government also ignores that Congress made clear that the Act can be raised in "the form of a complete defense, bar, or otherwise *at any time* during the … judicial action applicable thereto," 44 U.S.C. § 3512(b) (emphasis added), defeating the government's procedural waiver argument. Plain error review is inappropriate.

Second, the government erroneously argues that the Act is inapplicable because it "does not protect individuals against prosecution for making false statements on government forms." Gov't Br. 50–51 (quoting *United States v. Sasser*, 974 F.2d 1544, 1555 (10th Cir. 1992)). But Dr. Tao was not charged with making a false statement on a *government* form; he was charged with *failing to disclose* information in a *KU* form. And *Sasser* provides that the Act "protects individuals who fail to file information." 974 F.2d at 1554. Thus, the Act requires reversal under both ordinary and plain error review.[19]

---

[19] The government contends in a footnote that the Act should not apply in criminal cases, Gov't Br. 51 n.12, but in the same breath recognizes that the Ninth Circuit has already rejected this argument. *See United States v. Smith*, 866 F.2d 1092, 1099 (9th Cir. 1989) (holding that "PRA section 3512 by its terms prohibits the imposition of 'any penalty' against the appellants, including criminal convictions"). It also asserts that the Act applies only to collections of information "by a federal agency," Gov't Br. 51 n.12, but this ignores that it also applies to collections "for" a federal agency, 44 U.S.C. § 3502(3)(A), which, according to the government's (meritless) jurisdictional argument, is exactly what the KU form did. In any event, the government waived both of these arguments by making them perfunctorily in a footnote. *See, e.g.*, *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

**IV.    The government fails to rebut Dr. Tao's alternative arguments in support of a new trial.**

     **A.    The conviction resulted from two constructive amendments of the indictment, each of which was a fatal variance that requires reversal or a new trial.**

The government admits all of the facts necessary to reverse or grant a new trial based on fatal variances. It does not dispute that during closing arguments the prosecutor asserted, *three times*, as to Count 9 that Dr. Tao "cause[d] KU to make a false statement." JA-V12-2620–21 ("[T]his is the count that the defendant caused KU to make a false statement … And he causes KU to make a false statement. … The defendant … caused to be made the statements …."). Its claim that this was a reference to agency jurisdiction, Gov't Br. 55, ignores the substance of the statement. And it is contradicted by the prosecutors' argument in post-trial briefing on Count 9 that Dr. Tao caused KU's "earlier statements of compliance to NSF to be [retroactively] false." ECF No. 302 at 57.

The government's attempt to minimize this variance also fails. *Id.* The closing argument spanned 20 transcript pages, but only three paragraphs discussed Count 9, and these were the only statements that identified the false statement. *See* JA-V12-2620–21. The government's argument that "the district court correctly instructed the jury on the charged false statement," Gov't Br. 56, fails to address Dr. Tao's counter that the instruction actually supported the new unalleged theory, *see* Tao Br. 44, because, over Dr. Tao's objection, and at the government's request, the District

Court provided an 18 U.S.C. § 2 instruction that authorized the jury to convict on the new theory. *Id.*; *see* JA-V1-145 ("A defendant may be found guilty of the crimes charged … if the defendant willfully caused an act to be done that if directly performed by him would be an offense ….").

The government also fails to point to language in Count 9 that references its false-certification theory—adopted by the government for the first time after trial. Count 9's reference to the form in which Dr. Tao allegedly failed to make the disclosures does not mean the government can—after trial—argue for affirmance based on any statement in the form. *Ciminelli*, 2023 WL 3356526, at *5.

The claim that Dr. Tao did not raise these issues below is contradicted by the record. Gov't Br. 53. Dr. Tao repeatedly asserted in his post-trial brief that the government's new theory in Count 9 "was an improper variance from the SSI," ECF No. 290 at 2, 37, 40, and that "[t]he government did not prove a certification or other affirmative false statement, dooming Count 9." *Id.* at 41. These constructive amendments are fatal variances requiring reversal or at a minimum a new trial.

## B.    The District Court failed to instruct the jury about two of Dr. Tao's main defenses.

The government fails to rebut that the District Court improperly refused to instruct the jury on two of Dr. Tao's main defenses. Gov't Br. 56–57. Its argument that the disclosure criteria in the KU form was unambiguous does not withstand scrutiny, *see supra* § I.B.1, 2, and its claim that application of the Paperwork

Reduction Act is a pure question of law is unsupportable, since it involved the application of law to facts (*e.g.*, whether the KU form lacked an OMB number). A properly instructed jury would have acquitted Dr. Tao, and Dr. Tao fully expects a new jury to do so if he is granted a new trial.

## CONCLUSION

Lies to an employer about job offers or even second jobs may justify an employee's termination by H.R. But only in an Orwellian nightmare would an employee reasonably think that he could be indicted and face years in prison for this kind of reticence. In a limited government like ours, federal funding to an entity does not allow prosecutors to invade the employee-employer relationship and transform H.R. matters into federal felony prosecutions.

Just this month, the Supreme Court reiterated that courts should not "vastly expand[] federal jurisdiction without statutory authorization," as otherwise "almost any deceptive act could be criminal." *Ciminelli*, 2023 WL 3356526, at *5. Nor should courts read statutes to "place under federal superintendence a vast array of conduct traditionally policed by the States," *id.*, or, in this case, by a state university's H.R. Department. Courts should not "criminalize[] traditionally civil matters and federalize[] traditionally state matters." *Id.* Nowhere do these principles have greater resonance than in this case. The Court should reverse.

Respectfully submitted,

*/s/ Peter R. Zeidenberg*

PETER R. ZEIDENBERG
MICHAEL F. DEARINGTON
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
(202) 857-6000
peter.zeidenberg@afslaw.com
michael.dearington@afslaw.com

Counsel for Feng "Franklin" Tao

## CERTIFICATE OF COMPLIANCE

1.      The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,499 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 10th Cir. R. 32(B).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Peter R. Zeidenberg*
Peter R. Zeidenberg

## CERTIFICATE OF SERVICE

I certify that on this 24th day of May, 2023, I caused a true and correct copy

of the foregoing brief to be filed with the Court and served via CM/ECF on the party

set forth below:

Joseph Patrick Minta
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
202-353-9055

*/s/ Peter R. Zeidenberg*
Peter R. Zeidenberg