**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 11, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 23-3013 |
| FENG TAO, | |
| Defendant - Appellant. | |

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:19-CR-20052-JAR-1)**

_____

Michael F. Dearington (Peter R. Zeidenberg with him on the briefs) of ArentFox Schiff LLP, Washington, D.C., for Defendant-Appellant.

Joseph P. Minta, Attorney, Appellate Unit, National Security Division, U.S. Department of Justice, Washington, D.C. (Kate E. Brubacher, United States Attorney for the District of Kansas; Matthew G. Olsen, Assistant Attorney General for National Security, with him on the brief), for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, **BRISCOE**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

From 2014 until his arrest in 2019, Feng "Franklin" Tao was a tenured professor at the University of Kansas (KU). During his employment, Tao conducted research funded by two federal agencies—the U.S. Department of Energy (DOE) and

the National Science Foundation (NSF). At the same time, he developed a relationship with a university in China and concealed it from KU. As a result, Tao found himself facing ten federal charges and now stands convicted by a jury of one crime: making a materially false statement in a matter within the jurisdiction of the executive branch, in violation of 18 U.S.C. § 1001(a)(2). Because we agree with Tao that the government offered insufficient evidence for a rational jury to find that his statement to his employer was material to any DOE or NSF decision, we reverse Tao's conviction and remand for the district court to enter a judgment of acquittal.

## Background

This case began as an espionage investigation. A visiting scholar at KU was angry with Tao over an authorship dispute and threatened to report him as a "tech spy" to the FBI if he refused to pay her $300,000, noting that this kind of espionage "was a popular topic these days with the FBI." App. vol. 11, 2336. When Tao ignored her demand, the scholar made good on her threat—she submitted an anonymous tip to the FBI accusing Tao of economic espionage and later impersonated others to make additional espionage allegations. As a result, the FBI launched an espionage investigation.

In the end, the FBI found no evidence of espionage. But the FBI learned that Tao had potentially accepted a second full-time professorship at Fuzhou University in China and hid it from KU. For this conduct, the government charged Tao with three counts of making false statements, in violation of 18 U.S.C. § 1001(a)(2), and seven counts of wire fraud, in violation of 18 U.S.C. § 1343. The false-statement counts

2

alleged that Tao concealed his relationship with Fuzhou University in certain documents, including, as relevant to this appeal, an annual institutional-responsibilities form that he submitted to KU in September 2018. The wire-fraud counts alleged that by failing to disclose his relationship with Fuzhou University, Tao defrauded KU of his salary and the DOE and the NSF of federal grant funds. Before trial, Tao twice moved to dismiss the indictment. The district court denied both motions, and the government then voluntarily dismissed one false-statement count and one wire-fraud count.

In March 2022, Tao proceeded to trial on the remaining eight counts. The government's case-in-chief spanned almost two weeks, involved over 30 witnesses, and included nearly 400 exhibits. The evidence at trial showed that Tao was a tenured associate professor in KU's departments of chemistry and chemical and petroleum engineering. When he joined the KU faculty in 2014, Tao brought with him a research grant from the NSF. A few years later, in October 2017, KU submitted a grant proposal to the NSF seeking funding to support another of Tao's research projects. And in December 2017, KU submitted a renewal proposal to the DOE requesting funding for Tao to continue a DOE-funded research project beyond the initially approved period.[1] Both agencies awarded the funds the next year. Throughout his time at KU, Tao focused his research on catalysis, which concerns

---

[1] A witness from the DOE testified that this renewal proposal sought the "continuation of a prior grant," but it is unclear from the trial record when the DOE received and funded the original grant proposal. App. vol. 5, 1145.

changes in the rates of chemical reactions, and published prolifically in respected scientific journals.

As a KU employee, Tao's responsibilities included following all university policies, including the Commitment of Time, Conflicts of Interest, Consulting, and Other Employment Policy—a policy developed "to conform to [f]ederal regulations governing research."[2] App. vol. 12, 2686. This conflict policy requires, among other things, that faculty members annually submit an institutional-responsibilities form, which in turn instructs faculty members to report their "significant financial interests" and "time commitments in external professional activities." *Id.* at 2728 (capitalization standardized). The form also requires faculty members to "report any changes . . . as soon as they become known . . . and no later than 30 days after acquiring a new significant financial interest." *Id.* at 2732. According to KU's assistant vice chancellor for research, institutional-responsibilities forms are "internal documents at KU" and are never "sent off to agencies," but KU uses the information disclosed on them when helping researchers prepare grant proposals. App. vol. 4, 793.

---

[2] As the government points out on appeal, 2 C.F.R. § 200.112 requires "[t]he [f]ederal awarding agency [to] establish conflict[-]of[-]interest policies for [f]ederal awards" and the grantee organization to "disclose in writing any potential conflict of interest to the [f]ederal awarding agency . . . in accordance with applicable [f]ederal[-]awarding[-]agency policy." Although the government did not introduce this regulation at trial, the evidence showed that the NSF had established a policy on conflicts of interest in its Proposal and Award Policies and Procedures Guide (PAPPG). But there was no evidence that the DOE had any such policy.

In July 2017, Tao applied to become a Changjiang Distinguished Professor at Fuzhou University under the Changjiang Scholar program, a prestigious Chinese talent-recruitment program sponsored by China's Ministry of Education. By January 2018, the Ministry of Education had named Tao a Changjiang Scholar. Fuzhou University then sent Tao a draft employment contract for a five-year, full-time appointment as a Changjiang Distinguished Professor at the university.

But given his full-time appointment at KU, the prospect of working full-time at Fuzhou University presented a problem for Tao. Seeking a solution, Tao called a colleague at another university and asked if it would be "feasible" to shift to a part-time appointment at KU so that he could accept the Fuzhou University position. App. vol. 15, 3331. The colleague suggested that Tao discuss the issue with KU, and Tao acknowledged that if he didn't "say anything, then . . . it would definitely be problematic if this thing were ever looked into." *Id.* at 3332. Tao also turned to a KU colleague for advice, but he framed his dilemma as involving a potential position at a German university and asked if "there [was] such a thing as . . . a half-half appointment" that would allow him to work at both universities. *Id.* at 3353. The colleague suggested that Tao obtain a course buyout from KU, which would provide a semester's release from his KU teaching responsibilities and free him to travel and work abroad. But if Tao wanted "to do half-and-half," the colleague cautioned, he should discuss the issue with his department chair. *Id.* at 3356.

Despite this advice, Tao continued considering the offer and did not disclose it to KU. Over the next few months, Tao and Fuzhou University exchanged draft

employment contracts and related documents. In early May, Tao took a three-day trip to China. The day before his flight, Fuzhou University sent Tao another draft contract, which provided that in exchange for five years of full-time teaching and research, Fuzhou University would pay Tao an annual salary, supply laboratory space, allocate funds for scientific equipment, and provide him a residence on campus. That same month, Tao received a certificate from the Chinese Ministry of Education certifying his appointment as a Changjiang Distinguished Professor at Fuzhou University. But the government introduced no direct evidence that Fuzhou University and Tao ever finalized an employment contract.

Throughout the spring and into the summer of 2018, Tao tried to set up a research team and laboratory at Fuzhou University. For example, he recruited graduate and postdoctoral students to join his team; helped a postdoctoral researcher on his KU research team receive a job offer from Fuzhou University; and directed this researcher to obtain price quotes from various vendors for laboratory equipment. Tao also prepared grant applications seeking research funding in China.

In June 2018, Tao obtained a course buyout at KU for the 2019 spring semester, purportedly to focus on research. And in September 2018, Tao submitted his annual institutional-responsibilities form for 2019—the form at the heart of this appeal. He left the disclosures section blank, making no mention of Fuzhou University:

6

## Annual for Feng Tao : Disclosure Details

**INSTRUCTIONS:**

**1. Make a new or update an existing disclosure**
Use the buttons below to create a new or modify an existing disclosure record for each external entity with which you have a Time Commitment and/or a Significant Financial Interest as defined in the Disclosure Criteria.

Use the "<<Back" button to return to the Disclosure Criteria for reference.

**2. When you are finished adding new or updating existing disclosures, OR if you have nothing to disclose,**
Click "Continue>>" to advance to the Assurance and Certification page.

**Disclosure reminders:**

- Disclose equity interests, remuneration or intellectual property interests for <u>yourself and family members</u> as previously defined.
- Disclose reimbursed or sponsored travel for <u>yourself only</u>.
- Disclose time commitments for <u>yourself only</u>. (Applies to faculty and unclassified staff)



**Disclosures Under Review (Disclosures under review may not be available for editing):**

| View/Edit | Organization | Is Public Company | Relationships | Disclosure Types | Total Value | Is Significant? | Last Updated | Remove |
|---|---|---|---|---|---|---|---|---|

There are no items to display

**Previously Reviewed Disclosures (Click 'Modify' ( ) or 'Remove' ( ) to enable editing):**

| Modify | View | Organization | Is Public Company | Relationships | Disclosure Types | Total Value | Is Significant? | Last Updated | Remove |
|---|---|---|---|---|---|---|---|---|---|

There are no items to display

App. vol. 12, 2730. By submitting the form to KU, Tao certified that his "report of significant financial interests and time commitments . . . [was] a true, correct, and complete statement" and that he had complied with KU's conflict policy. *Id.* at 2732. Tao then flew to China in December 2018 and spent most of his time there until his

7

arrest in August 2019. Upon his arrest, KU placed Tao on administrative leave, and the NSF and the DOE suspended the research grants.

At the close of the government's case, Tao moved for a judgment of acquittal, which he renewed after he presented his own case. *See* Fed. R. Crim. P. 29(a). The district court reserved ruling on both motions and submitted the case to the jury. After deliberating for nearly two days, the jury returned a split verdict, finding Tao guilty on three wire-fraud counts and one false-statement count but not guilty on the other four counts. Tao then again renewed his motion for acquittal, which the district court granted in part and denied in part. The district court acquitted Tao on the three wire-fraud counts, holding that the government failed to prove Tao engaged in a fraudulent scheme to deprive KU, the NSF, or the DOE of money or property. But it concluded that the government introduced enough evidence to support the one false-statement conviction based on the institutional-responsibilities form he submitted to KU in September 2018.[3]

So although the government charged Tao with ten counts, it dismissed two before trial, the jury convicted on four and acquitted on four at trial, and the district court then acquitted on three posttrial—leaving only a single false-statement jury conviction standing. For that conviction, the district court sentenced Tao to time served and two years of supervised release. Tao now appeals his conviction on the

---

[3] The district court also denied Tao's alternative request for a new trial.

8

single false-statement count.[4]

## Analysis

Tao argues that the evidence was insufficient to support his false-statement conviction under § 1001(a)(2). We review sufficiency challenges de novo, looking at "the evidence in the light most favorable to the government to determine whether a rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. Johnson*, 821 F.3d 1194, 1201 (10th Cir. 2016). In other words, "[t]he only question is 'whether the government's evidence, credited as true, suffices to establish the elements of the crime.'" *Id.* (quoting *United States v. Hutchinson*, 573 F.3d 1011, 1033 (10th Cir. 2009)).

Section 1001(a)(2) is a broad statute that makes it a crime to lie "in any matter within the jurisdiction of the executive . . . branch of the [federal g]overnment." To convict Tao under this statute, the government needed to prove that "(1) [he] made a statement; (2) the statement was false, fictitious, or fraudulent[,] as [he] knew; (3) the statement was made knowingly and willfully; (4) the statement was [made in a matter] within the jurisdiction of [a] federal agency; and (5) the statement was material." *United States v. Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019) (quoting *United States v. Harrod*, 981 F.2d 1171, 1175 (10th Cir. 1992)). Tao challenges all but the third of these elements. For our purposes, we will assume that Tao made a

---

[4] The government initially appealed the district court's order acquitting Tao on the three wire-fraud counts, but it later voluntarily dismissed its appeal. *See United States v. Tao*, No. 22-3203 (10th Cir. Nov. 28, 2022) (order granting motion to dismiss appeal).

false statement in a matter within the jurisdiction of the executive branch when he

certified on his 2019 institutional-responsibilities form that his "report of significant

financial interests and time commitments . . . [was] a true, correct, and complete

statement" and that he had complied with KU's conflict policy—despite failing to

disclose his relationship with Fuzhou University. App. vol. 12, 2732. Accordingly,

we confine our discussion to the last element: materiality.

A false statement is material if it has "a natural tendency to influence, or [is]

capable of influencing, the decision of the decision[-]making body to which it was

addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys v.*

*United States*, 485 U.S. 759, 770 (1988)). Materiality is a mixed question of law and

fact for the jury to resolve. *Id.* at 511–12, 522. In determining whether the

government introduced sufficient evidence to support the jury's materiality finding,

we first ask a subsidiary question: "what decision was the agency trying to make?"

*Id.* at 512. We then consider whether the false statement was "capable of influencing"

that particular decision. *Williams*, 934 F.3d at 1128 (quoting *United States v. Christy*,

916 F.3d 814, 854 (10th Cir. 2019)). This materiality test is objective, so the

individual decision-maker need not actually rely on the statement, or even consider it

at all, in making the decision. *Id.* at 1129. Indeed, a statement can be material even if

that decision-maker internally "arrived at [their] conclusion before the statement

[wa]s made." *Id.* at 1130. But under the objective materiality test, there must still be

an actual decision at issue before the agency—a decision that the statement, once

made, has "the *capability* to . . . influence." *United States v. Irvin*, 682 F.3d 1254,

1268 (10th Cir. 2012); *see also, e.g.*, *Williams*, 934 F.3d at 1125–26, 1130 (holding that because materiality standard is objective, veteran's false testimony at informal hearing about overseas service was material to benefits decision made nearly one year *after* that hearing, even though decision-maker subjectively determined before such hearing that veteran's testimony would not change her view that he had not served overseas).

Here, Tao correctly points out that neither the government nor the district court ever identified any decision that either the DOE or the NSF was "trying to make." *Gaudin*, 515 U.S. at 512. Nevertheless, attempting to meet its burden on appeal, the government now contends that the "agencies were considering whether to fund or to continue funding Tao's research" and that Tao's false statement could have influenced these funding decisions. Aplee. Br. 46. Alternatively, the government falls back on the district court's analysis, which reasoned that Tao's false statement was material to the NSF because the agency relies on KU to identify and manage conflicts of interest. But as we explain below, the evidence supports neither materiality theory.

## I.    Funding Decisions

We first consider whether Tao's false statement was material to the only agency decisions the government identifies on appeal: "whether to fund or to continue funding Tao's research." *Id.* In support of this materiality theory, the government points to testimony showing that the agencies require disclosure of all current and pending research support on a grant proposal—they need this information to assess the researcher's capacity to carry out the proposed research and any

potential overlap or duplication with the proposed project.[5] Based on this testimony, the government argues that KU would have disclosed information it obtained from Tao about any current or pending support he had from Fuzhou University when applying for research funding because KU "uses the [i]nstitutional[-r]esponsibilities form in assisting researchers applying for federal grants." *Id.* And this information, the government contends, could have then influenced the decisions to fund the NSF grant proposal and the DOE renewal proposal.

But the government's argument critically overlooks that both agencies received and funded the proposals *before* Tao submitted his institutional-responsibilities form to KU in September 2018. And KU never applied for additional funding after he did so. As the district court observed, "[t]he last proposal KU . . . submitted to a federal agency to support Tao's research was in 2017—before Tao had [even] been selected as a Changjiang Scholar." App. vol. 1, 195. In other words,

---

[5] The government's appellate brief does not explain what it means when it contends that the agencies were deciding "whether to fund or to continue funding Tao's research." Aplee. Br. 46. But the testimony the government relies on makes clear that it is referring to (1) the NSF's decision to fund the October 2017 grant proposal, which sought a new grant, and (2) the DOE's decision to fund the December 2017 renewal proposal, which sought the "continuation of a prior grant." App. vol. 5, 1145; *see also id.* at 960, 1135–36 (NSF representative testifying that if researcher participated in foreign talent-recruitment program promising research funds, such information would "need[] to be reported" in "the *proposal*" or in "an update *prior to award*," and that NSF would find it "concerning" if it "receive[d] *applications*" that failed to disclose funding sources or appointments (emphases added)); App. vol. 6, 1187–88 (DOE program manager testifying that "in reviewing . . . Tao's *renewal proposal*," she would have wanted to know about any current and pending support, including whether he "was receiving research support from a foreign university" (emphasis added)).

neither the DOE nor the NSF had any proposals pending before them when Tao made his statement or at any point since then. So contrary to the government's argument, KU could not have "forward[ed] the information" to the agencies when it helped Tao apply for research funds. Aplee. Br. 48; *see also United States v. Meuli*, 8 F.3d 1481, 1485 (10th Cir. 1993) (holding that false statements were material to IRS even though made to third parties where it was "not only reasonably foreseeable, but inevitable, that the recipient[s] would contact the IRS concerning the[] false statements"). But even if the statement could somehow have reached the agencies, there were no proposals pending before the agencies and therefore no funding decisions for them to make. And without evidence of an actual decision capable of being influenced by the statement, the government cannot establish materiality.[6] *See Gaudin*, 515 U.S. at 512.

The dissent, however, would disregard that Tao's statement was incapable of influencing an actual funding decision. In the dissent's view, it is enough that the statement is the type of information the agencies would "want to know when deciding whether to award research grants," even if there was no such decision for either agency to make at the time. Dissent 23. To support its proposed materiality test, the dissent invokes language from *United States v. McBane*, 433 F.3d 344 (3d Cir. 2005), that we have favorably cited. *See Williams*, 934 F.3d at 1130 n.9. In

---

[6] Contrary to the dissent's understanding, our analysis does not rest on the fact that Tao's statement was never "seen, considered, or relied on by the agencies." Dissent 22. Tao's statement was not material because it was incapable of influencing an actual funding decision.

*McBane*, the Third Circuit said that a false statement need only be "of a type capable of influencing a *reasonable* decision[-]maker" because "the phrase 'natural tendency' connotes qualities of the statement in question that transcend the immediate circumstances in which it is offered and inhere in the statement itself." 433 F.3d at 351. But as we explained in *Williams*, this simply means the test for materiality is an objective one that does not turn on the subjective views of the decision-maker—not that there need not be an actual decision reasonably capable of being influenced by the statement.[7] *See* 934 F.3d at 1130. As the Third Circuit itself recently explained, materiality requires not only that the false statement be "'of a type capable of

_____

[7] Resisting this conclusion, the dissent seizes on the next sentence in *Williams*, which explains that a false statement can "be material even if the decision[-]maker had already arrived at her conclusion before the statement is made." 934 F.3d at 1130. Yet this single sentence makes only the unremarkable observation that because the materiality standard is objective, whether the decision-maker had subjectively made up their mind before the defendant made the statement is irrelevant. *See id.* It does not change the requirement that the statement, once made, must have the objective capability to influence an actual decision to be made by the agency. *See id.* at 1128 (explaining that false statement must have been "capable of influencing" a decision "the decision[-]maker [was] considering" (quoting *Christy*, 916 F.3d at 853–54)); *Gaudin*, 515 U.S. at 512 (same). Indeed, *Williams* itself illustrates this requirement. There, a veteran falsely testified at an informal hearing that he had served in combat overseas to obtain undeserved benefits. *Williams*, 934 F.3d at 1124–26. Before the hearing, the review officer had subjectively concluded that even if the veteran testified about having served overseas, such testimony would not convince her of that service. *Id.* at 1130. But setting aside that subjective view, we held, the false statement was material because it was objectively capable of influencing the agency's subsequent benefits decision, which was not issued until nearly a year after the hearing: the veteran "falsely testified about combat service in Iraq to persuade the [r]eview [o]fficer of that service" and placed "the issue squarely before the [r]eview [o]fficer to decide." *Id.* at 1129. Thus, unlike in this case, there was an actual decision in *Williams* that the statement had the capability to influence. *See id.* at 1129–30.

14

influencing a *reasonable* decision[-]maker,'" but also that the "statement[] could have bearing on an actual *decision* entrusted to the decision[-]maker." *United States v. Johnson*, 19 F.4th 248, 257 (3d Cir. 2021) (second emphasis added) (quoting *United States v. Moyer*, 674 F.3d 192, 215 (3d Cir. 2012)). Or as the Second Circuit has put it, to prove materiality, the government must present "evidence of an actual *decision* of the [agency] that was reasonably capable of being influenced by" the statement. *United States v. Litvak*, 808 F.3d 160, 172 (2d Cir. 2015). And "[t]o form the basis of a jury's conclusion, evidence of such a decision cannot be purely theoretical and evidence of such a capability to influence must exceed mere metaphysical possibility." *Id.* at 172–73.

Our own decision in *United States v. Camick*, 796 F.3d 1206 (10th Cir. 2015), drives this point home. There, the defendant posed as his deceased brother and filed a provisional patent application with the U.S. Patent and Trademark Office (PTO). *Id.* at 1210–11. Based on this conduct, the government obtained multiple jury convictions against him, including one for making a false statement under § 1001. *Id.* at 1212–13. We reversed, agreeing that the government failed to establish materiality because the defendant filed only a provisional patent application, which the PTO does not review for patentability. *Id.* at 1218–19. And although the statements in a provisional application can become material to the PTO if the applicant converts or incorporates it into a nonprovisional application, the defendant never did so. *Id.* Because there was no actual decision to influence, the statements were not material. *Id.* So too here: there were no proposals pending before the DOE or the NSF and thus

15

no funding decisions that Tao's statement could have influenced, rendering the statement immaterial.[8]

## II.    Conflict Management

The government's reliance on the district court's materiality analysis fares no better. According to the district court, Tao's false statement was material to the NSF because it "prevented KU from fulfilling its responsibility" under the PAPPG's conflict policy to determine whether Tao's relationship with Fuzhou University

---

[8] Perhaps recognizing as much, the dissent additionally suggests that Tao's false statement was capable of influencing an agency decision even after the DOE and the NSF awarded the grants. Despite scouring the voluminous record on the government's behalf, however, the dissent has identified no evidence showing that either agency required KU to report Tao's relationship with Fuzhou University during the grant periods, much less that such information could have then influenced an agency decision. *See United States v. Lewis*, 594 F.3d 1270, 1275 (10th Cir. 2010) ("[I]t is not this court's duty to scour without guidance a voluminous record for evidence supporting the government's [case]."). At best, the dissent invokes *KU's* requirement that Tao "report any changes" to his institutional-responsibilities form "as soon as they become known"—an ongoing reporting requirement that is internal to the university. Dissent 24 (quoting App. vol. 12, 2732). The dissent also emphasizes that an NSF representative and a DOE program manager testified the agencies require reporting of all current and pending research support so they can assess capacity, but both witnesses were describing reporting requirements that apply exclusively at the proposal stage. The only agency requirement the dissent points to that applies during the grant periods is the NSF's requirement that KU obtain approval before changing the "'objectives or scope of the project,'" including when "the university needs to change the principal investigator." *Id.* at 25 (quoting App. vol. 5, 996). But the trial record contains no evidence that KU, had it known about Tao's activities at Fuzhou University, would have sought NSF approval to replace him with a new principal investigator. Simply put, the evidence the dissent relies on doesn't support its speculative view that Tao's false statement could have influenced some unidentified agency decision during the grant periods. *See Christy*, 916 F.3d at 843 ("A jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility." (quoting *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013))).

presented a conflict of interest and, if so, whether KU needed to manage the conflict. App. vol. 1, 233. But this rationale fails to identify any agency decision that Tao's false statement could have influenced, and the government makes no effort to bridge that gap on appeal. The government's failure to establish that the statement was "capable of influencing" any "decision of the decision[-]making body to which it was addressed"—conflicts-related or otherwise—is fatal to the materiality element. *Gaudin*, 515 U.S. at 509 (quoting *Kungys*, 485 U.S. at 770).

But even if, for argument's sake, we were to assume that KU's conflict-management responsibilities under the PAPPG's conflict policy involved an NSF decision, no reasonable jury could find that Tao's false statement could have influenced it. To be sure, the PAPPG provides that before "the expenditure of the award funds," the grantee organization must identify and then manage, reduce, or eliminate "all conflicts of interest for each award" (or report to the NSF any conflicts that "it is unable to satisfactorily manage"). App. vol. 14, 3072–73. But critically, the PAPPG does not apply to any and all potential conflicts. Rather, it requires researchers to disclose, and the organization to then review for conflicts of interest, only financial interests exceeding $10,000 that: (1) "reasonably appear to be affected by the research or educational activities funded . . . by [the] NSF" or (2) are "in entities whose financial interests would reasonably appear to be affected by such

activities."[9] *Id.* at 3072. And a conflict of interest exists only if the organization determines that the financial interest "could directly and significantly affect the design, conduct, or reporting of NSF-funded research." *Id.* at 3073. Yet at trial, the government neither argued nor presented evidence that Tao's relationship with Fuzhou University created a disclosable financial interest under the PAPPG. Even on appeal, as Tao points out, the government does not argue as much. And without such evidence, no reasonable jury could find that the PAPPG's conflict policy required KU to review the relationship and determine whether it presented a conflict of interest.

Perhaps sensing this stumbling block, the government asserts without analysis that Tao's statement was nevertheless material because it was "part of the regulatory

---

[9] We pause to note that on the falsity element, the dissent would hold that the government proved Tao had a disclosable time commitment under KU's conflict policy but failed to prove a disclosable financial interest. Because we assume the government adequately established falsity, we need not address this issue. But it is worth mentioning that if we were to agree that Tao had only a time commitment, our materiality analysis would end here, with the fact that the PAPPG's conflict policy does not apply to time commitments. Insisting otherwise, the dissent maintains that "[t]his conclusion is rebutted by looking at the NSF's written policy," but it then confusingly quotes from the PAPPG's proposal preparation instructions, not the PAPPG's conflict policy. Dissent 24–25. The dissent also says that our "conclusion is rebutted by" an NSF representative's testimony "regarding the PAPPG," during which she listed "'other sources of employment' as an example of a potential conflict of interest." *Id.* (quoting App. vol. 5, 982). The dissent is mistaken. As we explain above, the PAPPG's conflict policy expressly limits the scope of conflict-related information a grantee organization must collect and review to certain financial interests exceeding $10,000. While another source of employment may create such a financial interest, the government—as we also explain above, and as the dissent itself concedes—offered no evidence that Tao's relationship with Fuzhou University resulted in one.

structure" governing conflicts of interest for federal research awards under 2 C.F.R. § 200.112. Aplee. Br. 47 (quoting *United States v. Wolf*, 645 F.2d 23, 26 (10th Cir. 1981)). But the jury never saw this regulation, and our appellate review is confined to "the evidence introduced at trial."[10] *United States v. Kimler*, 335 F.3d 1132, 1140 (10th Cir. 2003); *cf. also United States v. Rigas*, 490 F.3d 208, 231 n.29 (2d Cir. 2007) (declining to "consider in the first instance arguments regarding materiality that were not presented to the jury" because "[a]lthough a statement's materiality may present a question of law resolvable by an appellate court in some contexts, a criminal defendant is entitled to have a jury determine [their] guilt on every element of [their] alleged crime" (citations omitted)). Indeed, the government chose not to introduce any regulations governing federal research awards into evidence and then successfully objected when Tao tried to do so, arguing in part that they were not "relevan[t]." App. vol. 4, 722.

Even if we could consider § 200.112, it would not help the government establish materiality. That regulation merely requires "[t]he [f]ederal awarding agency [to] establish conflict[-]of[-]interest policies for [f]ederal awards" and the grantee organization to "disclose in writing any potential conflict of interest to the [f]ederal awarding agency . . . *in accordance with applicable* [*f*]*ederal*[-]*awarding*[-]

---

[10] The jury did hear some testimony about the regulation at trial, but that testimony establishes only that the regulation required KU to "have some type of controls around conflict[s] of interest" in place. App. vol. 2, 409 (testimony of KU's assistant vice chancellor for research). And testimony that the regulation required KU to maintain a conflict policy does nothing, standing alone, to establish that Tao's statement to KU was capable of influencing a DOE or NSF decision.

*agency policy.*" § 200.112 (emphasis added). In other words, the regulation does not, by its own terms, require Tao to disclose to KU his external time commitments or significant financial interests.[11] Instead, it simply refers back to the agencies' own conflict policies. The DOE, however, lacked any such policy. And as already discussed, the NSF's conflict policy required Tao to disclose only financial interests over $10,000 that "reasonably appear[ed] to be affected by the research" and required KU, in turn, to disclose to the NSF only financial interests that "could directly and significantly affect the design, conduct, or reporting of NSF-funded research" and could not be managed. App. vol. 14, 3072–73. But again, the government presented no evidence that Tao had a disclosable financial interest under the PAPPG, much less a conflict of interest that KU could not manage. Thus, § 200.112 did not require— either directly or indirectly—that Tao disclose his relationship with Fuzhou University to KU as part of the regulatory structure governing research awards. *See Wolf*, 645 F.2d at 24–26 (holding that defendant's false crude-oil certification to private oil company was material to DOE where certification was required by DOE regulations and was later provided in monthly report to DOE, "which in turn based its 'entitlement' program on these reports," such that certification "was a basic part of the regulatory structure").

Before we conclude, a final point warrants our attention. The government asserts that the agencies suspended Tao's grants "when the truth about [Tao's]

---

[11] It also bears noting that the regulation does not define "potential conflicts of interest" or even mention time conflicts.

activities [at Fuzhou University] came to light" and suggests this confirms it proved materiality. Aplee. Br. 49. But that assertion borders on misrepresentation: the testimony the government relies on merely shows that the agencies notified KU about suspending the grants "after *the allegations in this matter* came to light." App. vol. 3, 530 (emphasis added). Indeed, the agencies suspended the grants shortly after Tao's indictment on federal criminal charges alleging that he fraudulently obtained the federal funds. And as should be obvious, the government may not manufacture materiality by charging someone with a federal crime. The false statement itself—not the indictment brought by the government—must be material to the agency. *See Williams*, 934 F.3d at 1128. We reject the government's attempt to conflate the materiality of Tao's false statement with that of his indictment.

In short, no reasonable jury could find that Tao's statement to KU was material to either the DOE or the NSF. We therefore reverse Tao's conviction.[12]

## Conclusion

Section 1001 sweeps broadly, but it is not unbridled. In this case, the government offered insufficient evidence for a reasonable jury to conclude that Tao's statement was material to any agency decision. And because materiality is an essential element of any § 1001(a)(2) offense, we reverse and remand for the district court to enter a judgment of acquittal.

---

[12] Having concluded that Tao's conviction rests on insufficient evidence, we need not consider his alternative arguments that the government violated his due-process rights and the Paperwork Reduction Act or his assertion that he is entitled to a new trial.

No. 23-3013, *United States v. Tao*
**BRISCOE**, Circuit Judge, dissenting.

The majority reverses Tao's conviction and remands for entry of a judgment of acquittal after concluding there was insufficient evidence for a reasonable jury to find that Tao's false statement was material. I respectfully dissent.

The majority agrees: 1) that Tao's false statement need not be seen by the agencies, or actually influence their decisions to be material; 2) that it is enough if the false statement merely had the capability of influencing agency decisions; and 3) that the false statement can be material even if the agencies had arrived at a decision before the statement is made. Majority Op. at 10 (first citing *United States v. Williams*, 934 F.3d 1122, 1129–30 (10th Cir. 2019); and then citing *United States v. Irvin*, 682 F.3d 1254, 1268 (10th Cir. 2012)).

To conclude that Tao's false statement was not material, the majority focuses on whether there was any "actual decision at issue" before the Department of Energy (DOE) or the National Science Foundation (NSF)—"a decision that the statement, once made, ha[d] the *capability* to . . . influence." *Id.* at 10.[1] Despite determining that there was no actual decision at issue, the majority also identifies specific grant decisions: "1) the NSF's decision to fund the October 2017 grant proposal, which sought a new grant, and 2) the DOE's decision to fund the December 2017 renewal proposal, which sought the

---

[1] Neither *Williams* nor *Irwin* contains this chronological requirement that grant proposals must be pending when Tao makes his false statement. Information concerning Tao's time commitments to the Fuzhou University position were material to the agencies, which were at the same time funding his research.

1

'continuation of a prior grant.'" *Id.* at 12 n.5 (quoting App. vol. 5, 1145). These are both decisions that were capable of being influenced by Tao's false statement.

The majority rejects the relevance of these decisions because they were made before Tao's September 2018 false statement. *Id.* at 12. But that view is contrary to *Williams*, which the majority cites, where we held: "A false statement can be material regardless of its influence on the decisionmaker and can also be material even if the decisionmaker had already arrived at her conclusion *before* the statement is made." 934 F.3d at 1130 (citing *United States v. Williams*, 865 F.3d 1302, 1316 (10th Cir. 2017) (emphasis added). I would, therefore, conclude that Tao's time commitments were material to the agencies' funding decisions, whether made at the grant proposal stage (which the majority appears to concede), Majority Op. at 15–16, 16 n.8, or after the grants were awarded.

In Count 9 of the Second Superseding Indictment, the government alleges Tao made a false statement in his 2019 institutional responsibilities form, dated September 25, 2018, which Kansas University (KU) required him to complete as part of his employment. Specifically, Count 9 alleged: "[T]hrough his submission of [the] form, Tao falsely represented to [KU], an institution that requested and received funds from the U.S. Department of Energy and the National Science Foundation, that he had no conflicts of time or interest," when in truth he had conflicts of time or interest. App. vol. 1, 50. This form not only required Tao to certify that his answers were "true, correct, and complete" but also to report any changes to the form as soon as they became known to him. App. vol. 12, 2732.

2

Based on my reading of the record and applying the applicable standards of review, I would conclude that there was sufficient evidence to establish that Tao failed to disclose his conflicts of time commitment related to his potential position at Fuzhou University on the institutional responsibilities form and that this failure was material to federal agencies awarding research grants.[2]  I would also reject Tao's remaining arguments for reversing his conviction or remanding for a new trial and would affirm his conviction for violation of 18 U.S.C. § 1001(a)(2).

## I

We review the sufficiency of the evidence to support a conviction de novo to "determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt."  *United States v. Gordon*, 710 F.3d 1124, 1141 (10th Cir. 2013) (quoting *Irvin*, 682 F.3d at 1266).  In conducting this review, "we consider all of the evidence, direct and circumstantial, along with reasonable inferences, but we do not weigh the evidence or consider the relative credibility of witnesses."  *United States v. Griffith*, 928 F.3d 855, 868–69 (10th Cir. 2019) (quoting *United States v. Pickel*, 863 F.3d 1240, 1251 (10th Cir. 2017)).  Thus, our review is limited and deferential; "we may

---

[2] Upon a de novo review of the record, I agree with the district court that the evidence presented was insufficient to establish that Tao failed to disclose a significant financial interest, which is defined, in part, to include a financial interest worth $5,000 or more in any entity that "reasonably appears to be related to your University responsibilities."  *Id.* at 2728.  While Tao and Fuzhou University exchanged draft employment contracts, there was no direct evidence that they ever finalized an employment contract and that moneys were exchanged as a result.

reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 869 (quoting *Pickel*, 863 F.3d at 1251).

We review the district court's denial of a motion for a new trial for abuse of discretion, and we would reverse the district court "only if the court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances." *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015) (quoting *United States v. Zabriskie*, 415 F.3d 1139, 1144 (10th Cir. 2005)).

II

When Tao joined KU in 2014, he "agree[d] to follow all university policies," including the Kansas Board of Regents Commitment of Time, Conflict of Interest, Consulting, and Other Employment Policy (Commitment & Conflict Policy) and the Individual Financial Conflict of Interest Policy.  App. vol. 12, 2680.  The Commitment & Conflict Policy provides that "a conflict of interest occurs when there is a divergence between an individual's private, personal relationships or interests and any professional obligations to the university such that an independent observer might reasonably question whether the individual's professional actions or decisions are determined by considerations of personal benefit, gain or advantage." *Id.* at 2682.  "Conflicts of commitment usually involve issues of time allocation." *Id.*

The Commitment & Conflict Policy requires KU faculty members to: (1) report on an annual basis any "consulting arrangements, significant financial or managerial interests, or employment in an outside entity whose financial or other interests would reasonably appear to be directly and significantly affected by their research or other

4

university activities"; (2) disclose "on an ad hoc basis current or prospective situations that may raise questions of conflict of commitment or interest"; and (3) report on an ad hoc basis outside consulting activities, i.e., "all external personal, professional activities," and "secure approval prior to engaging in the activities." *Id.* at 2684–85.  Moreover, "[w]ithout prior approval," full-time faculty members "must not have significant outside managerial responsibilities nor act as principal investigators on sponsored projects that could be conducted at their institution but instead are submitted and managed through another organization." *Id.* at 2683.  After a real or apparent conflict of commitment or interest is reported, it must be either eliminated or managed "in an acceptable manner." *Id.* at 2682.

As a top-tier research university, KU maintains and enforces these policies, in part, to comply with 2 C.F.R. § 200.112, or the "uniform guidance," which requires universities to establish and abide by conflict of interest policies so that the university can apply for and receive federal research grants.  App. vol. 2, 408–09.  When KU submits information related to conflicts to a federal agency, it agrees to follow the uniform guidance and certifies that it will comply with the specific requirements of the agency, including the agency's conflict of interest requirements.  For example, the NSF maintains a written document called the Proposal and Award Policies and Procedures Guide (PAPPG), which includes sections describing conflicts of time or interest a grant applicant must report.  The PAPPG states that grant applicants must report "current and pending support," which includes "all current and pending . . . projects or activities requiring a portion of time of the [principal investigator] . . . even if they receive no

5

salary support from the project(s)." App. vol. 14, 3001.[3] The PAPPG also "requires each grantee organization . . . to maintain an appropriate written and enforced policy on conflict of interest and that all conflicts of interest for each award be managed, reduced or eliminated prior to the expenditure of the award funds." App. vol. 14, 3072. The DOE also makes universities responsible for handling conflicts of time or interest and is itself concerned with such conflicts, but it does not maintain a written policy on conflicts.

KU's Office of Research works with grant applicants not only in the pre-award phase but also in the post-award phase to ensure that federal funds are spent in accordance with applicable guidelines, policies, and procedures. Ensuring compliance is a joint responsibility. The Office of Research ensures each grant is administered in accordance with applicable guidelines, while the grant recipient is responsible for ensuring that the information about the research and the recipient's activities is accurate.

After the NSF and the DOE awarded grant funds to support Tao's research, KU managed and maintained possession of the federal grant money. Alicia Reed, the Assistant Vice Chancellor for Research at KU, testified that "each agency will have terms of allowability" and that allowable costs on a standard research award usually include salary, fringe benefits to support personnel, travel costs, and equipment and supplies necessary for research. App. vol. 3, 493. While at KU, Tao used his NSF and DOE grant funds to support his research projects. In 2019, for instance, KU purchased scientific

---

[3] Contrary to Tao's arguments, the NSF requires reporting of time commitments in addition to financial conflicts of interest. *Contra* Aplt. Br. at 31. Both are material to an agency's funding decisions, i.e., information that would influence the agency's decision making. *See id*. at 31–32 n.18.

equipment and supplies at Tao's request.  Tao also used grant funds to pay for salaries for him and his research team.

KU's method of gathering information about conflicts is through an annual certification process called the institutional responsibilities form, as well as an ad hoc requirement to update the form.  KU uses this information to comply with federal guidelines, respond to any conflicts that may arise, and prepare grant proposals.  KU required Tao, as a KU faculty member, to disclose on his 2019 institutional responsibilities form "all activities you perform in the scope of your work for the University."  App. vol. 12, 2725.  The form explains that "[t]his profile of your University responsibilities helps in determining whether your disclosed financial interests or time commitments (if applicable) could potentially conflict with your university responsibilities."  *Id.*  The form then goes on to require faculty members to disclose the following:

> **Disclosure Criteria for Time Commitments in External Professional Activities**
>
> Disclose any entity with which you engage in personal professional activities that take time away from your University responsibilities, whether or not you receive compensation, except for Single Occasion Activities as described below. . . .  The Board of Regents and University policy indicate that external activities of faculty and staff, such as consulting, outside employment, public service, pro bono work, or serving as an officer of an external entity, even without compensation, can result in real or apparent conflicts regarding commitment of time or effort.

*Id.* at 2728–29.

At the end of the form is a certification statement that KU required Tao to agree to before submitting the form.  Among other things, Tao certified that the form responses

were a "true, correct, and complete statement;" that he had "read and complied with

[KU's] policies on commitments of time, conflict of interest, consulting, and other

employment"; and that he agreed to report any changes as soon as they became known to

him and no later than thirty days after acquiring a new significant financial interest. *Id.*

at 2732. On the institutional responsibilities form Tao submitted for 2019, he disclosed

no conflicts of time or interest.

      In 2017, Tao was selected to be a Changjiang Scholar at Fuzhou University. A

Chinese university can propose a candidate to the Chinese government—via an

application that the university and the candidate prepare together—to be considered for

the Changjiang Scholar program. After selection as a Changjiang Scholar, the university

and the researcher negotiate the terms of their contract, which is subsequently submitted

to the Ministry of Education for approval. Employment as a Changjiang Scholar is

prestigious and comes with funding from the Chinese government. Throughout early

2018, Fuzhou University and Tao negotiated the terms of his contract and exchanged

draft contracts, but the record does not contain an executed version of any contract

between Tao and Fuzhou University.

      Although Tao did not attach any disclosures to his 2019 institutional

responsibilities form dated September 25, 2018, the trial record is replete with testimony

describing the time Tao spent on activities related to his potential position at Fuzhou

University between at least March 2018 and December 2018. *See* App. vol. 9, 1878–88

(Tao's proposed equipment purchases and lab set-up schedules); App. vol. 10, 2014–16

(Tao's student advisor selection forms); *id.* at 2039 (email from Tao stating he was

8

having difficulty recruiting a group in Fuzhou and asking for staffing recommendations); *id.* at 2035 (Tao using a taofeng@fzu.edu.cn email address to discuss lab equipment for Fuzhou University); *id.* at 2037–39 (Tao responding to an applicant who turned down a position with him: "I am very upset. I feel as if I've been made a fool. It's very painful. I helped you write the ACS sustainable paper, which you never participated in and then published. I spent so much time and energy on guiding you step by step from discussions to getting results. All were done on the premise that you agreed to join the team and continue to make contributions to scientific research. To get you your job title, people at all levels had helped, and the school even planned to have your boyfriend join Fuzhou University."); *id.* at 2134 (testimony regarding another individual who turned down a job offer from Tao to work at Fuzhou University); *id.* at 2033 (Tao requesting an ad for a position at Fuzhou University be forwarded to interested applicants); *id.* at 2032 (Tao responding to an interested applicant as follows: "I have a collaborative project with Dr. Huimin Liu at Fuzhou University in China.").  In 2018 and 2019, Tao traveled extensively to China, spending most of his time in China from December 11, 2018, to August 20, 2019.  Tao's conflicts of time commitment related to the Fuzhou University position were not reported to KU or the federal agencies funding his research grants.  As the district court noted, "[t]he last proposal KU . . . submitted to a federal agency to support Tao's research was in 2017—before Tao had been selected as a Changjiang Scholar.  But Tao made no ad hoc disclosures thereafter either."  App. vol. 1, 195.

III

When considering the sufficiency of the evidence, "[t]he only question is 'whether the government's evidence, credited as true, suffices to establish the elements of the crime.'" [4] *United States v. Johnson*, 821 F.3d 1194, 1201 (10th Cir. 2016) (quoting *United States v. Hutchinson*, 573 F.3d 1011, 1033 (10th Cir. 2009)).  To support a conviction for making a false statement under 18 U.S.C. § 1001(a)(2), the government must prove five elements beyond a reasonable doubt: "(1) the defendant made a statement; (2) the statement was false, fictitious, or fraudulent as the defendant knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material."  *Williams*, 934 F.3d at 1128 (quoting *United States v. Harrod*, 981 F.2d 1171, 1175 (10th Cir. 1992)). These elements were set forth in Instruction 13 given to the jury at Tao's trial. [5]  App. vol. 1, 143–44.  Instruction 13 also included the following definitions to assist the jury in understanding key phrases contained in the elements:

> A "false statement or representation" is an assertion that is untrue when made or when used and which is known by the person making it or using it to be untrue when made or when used.
>
> A matter is within the jurisdiction of the executive branch of the United States if an agency has the power to exercise authority in a particular

---

[4] Although the term "the government's evidence" could be interpreted as excluding evidence presented by Tao, all evidence presented at trial should be considered.  *See* Fed. R. Crim. P. 29(a).

[5] Although Instruction 13 names Counts 7 and 8 as the relevant counts, the instruction corresponds to Counts 8 and 9 of the Second Superseding Indictment.  The district court renumbered the counts of the Indictment for trial after it granted the government's motion to dismiss Counts 3 and 8.

situation. The false statement or representation need not be made directly to the agency or department.

A fact is "material" if it has a natural tendency to influence or is capable of influencing a decision of the federal agency; specifically for Count 7, the National Science Foundation or the U.S. Department of Energy; and for Count 8, the U.S. Department of Energy.

It is not necessary that the agency was in fact influenced in any way.

If you find that the government has not proved any one of the essential elements beyond a reasonable doubt, you must acquit the defendant.

*Id.* at 144.

On appeal, Tao contests the sufficiency of the evidence as to all but element three. The majority addresses only materiality to conclude Tao's statements, even if assumed false, were not material because his grants were awarded *before* he filed his institutional responsibilities form on September 25, 2018. Restricting our materiality analysis in this way does not square with precedent, or with the instructions the jury was given. Tao's false statement need not be seen by the agencies or actually influence their decisions. The test for materiality is satisfied if information conveyed by Tao's representations merely had the *capacity* of influencing the agencies' decisions.

*1. Tao made a statement.*

Tao briefly argues that there was insufficient evidence that he certified his 2019 institutional responsibilities form because the certification statement at the end of his submitted form had an unchecked box, which, if checked, would have indicated his agreement to the certification statement. Ms. Reed, the Assistant Vice Chancellor for Research at KU, testified that it is impossible to electronically submit the form unless the

box is checked.  Viewing the evidence in the light most favorable to the government, there was sufficient evidence to allow the jury to find that Tao had submitted the form and had agreed to the certification statement.  *See United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008).

## 2.  Tao's form was false.

Tao argues that his 2019 institutional responsibilities form was correct, or at minimum, not objectively false.  Under § 1001, "the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous."  *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994).  "Leaving a blank is equivalent to an answer of 'none' or a statement that there are no facts required to be reported."  *United States v. Irwin*, 654 F.2d 671, 676 (10th Cir. 1981) (quoting *United States v. McCarthy*, 422 F.2d 160, 162 (2nd Cir. 1970)), abrogated on other grounds by *United States v. Daily*, 921 F.2d 994, 1004 (10th Cir. 1990).

When presented with evidence, "the jury may draw reasonable inferences from direct or circumstantial evidence, [and] an inference must be more than speculation and conjecture to be reasonable."  *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995). An inference is only reasonable if "the conclusion flows from logical and probabilistic reasoning."  *Id.*  A jury may not speculate and conject such that its finding is a "guess or mere possibility."  *Id.* (quoting *United States v. Jones*, 49 F.3d 628, 632 (10th Cir. 1995)).

KU required Tao to report "Time Commitments in External Professional Activities" on the institutional responsibilities form, specifically requiring his disclosure of "any entity with which you engage in personal professional activities that take time away from your University responsibilities," whether paid or not.  App. vol. 12, 2728.  The disclosure criteria also noted external activities of faculty "can result in real or apparent conflicts regarding commitment of time or effort."  *Id.* at 2729.  By electronically submitting the form, Tao certified that (1) the form was "true, correct, and complete," (2) he had "read and complied with the Kansas Board of Regents and University of Kansas policies on commitment of time, conflict of interest, consulting and other employment," (3) he would "secure approval" for any "consulting and outside employment" before engaging in the activities, and (4) he would "report any changes" to the form "as soon as they become known to [him] and no later than 30 days after acquiring a new significant financial interest."  *Id.* at 2732.

The evidence clearly shows Tao was spending time on his potential position and managerial responsibilities with Fuzhou University, while at the same time not reporting these conflicts of time or interest to KU, the NSF, or the DOE.  While Tao does not deny that he participated in these activities, he argues instead that he did not need to report these time commitments because the questions on the form were arguably ambiguous.

The determining factor as to whether Tao needed to disclose "Time Commitments in External Professional Activities" is whether the activities "take time away from your University responsibilities."  *Id.* at 2728.  Again, the form required disclosure of "*any entity* with which you engage in professional activities that take time away from your

13

University responsibilities . . . ." *Id.* (emphasis added).  One possible interpretation of this question is that one hundred percent of the employee's time belongs to KU, such that any activity that takes any time and is not expressly exempt from the policy must be disclosed.  A second interpretation is that a set number of hours belongs to KU, and any activity that would reduce the time devoted to KU below that number must be disclosed.  Similarly, an employee could consider certain days or times of day to belong to KU, and any activity that occurs during these hours or alters their schedule must be disclosed.

None of the interpretations of the question leads to a perfect outcome.  Depending on the interpretation, employees could be required to report activities obviously not contemplated by the policy; the same activity could be reportable for some employees but not others; or an employee could evade reporting requirements by avoiding any impact on their total hours or schedule.  Regardless, since there is more than one reasonable interpretation of the question on "Time Commitments in External Professional Activities," and since it is still possible to give a false answer on the form, this portion of the form is an arguably, but not fundamentally, ambiguous question.  *See United States v. Schulte*, 741 F.3d 1141, 1153 (10th Cir. 2014); *United States v. Strohm*, 671 F.3d 1173, 1179, 1179–81 (10th Cir. 2011).  As such, under § 1001, "the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct." *Migliaccio*, 34 F.3d at 1525.

The evidence presented at trial negates any interpretation of the form that would make Tao's responses correct, i.e., that he had no conflicts of time commitment to report. Recall that Tao disclosed none of his activities related to Fuzhou University either before,

14

during, or after his selection as a Changjiang Scholar at Fuzhou University in 2017. By September 25, 2018, when his 2019 institutional responsibilities form was submitted, Tao had agreed to engage in "external . . . professional activities" for Fuzhou University. App. vol. 12, 2684. If one hundred percent of Tao's time belonged to KU, all of Tao's activities with Fuzhou University would be reportable. Or if the criteria for a reportable activity was a reduction in hours or change in schedule, the evidence—viewed in the light most favorable to the government—would still have allowed the jury to find that (1) Tao subsequently obtained a buyout[6] to reduce or alter his hours or schedule at KU, and (2) that this meant Tao had a time conflict to report on his previously filed 2019 institutional responsibilities form. *See* App. vol. 8, 1694–95, vol. 15, 3355 (phone call in which Tao is advised to combine a buyout of his fall or spring semester teaching responsibilities at KU with a summer in China to maintain both the KU and Fuzhou University positions); App. vol. 12, 2586–87 (Tao's wife agreeing that she told the FBI she understood Tao had a side job with Fuzhou University); *but see id.* at 2585 (Tao's wife testifying that Tao took many trips to China because his mother was sick). Therefore, even though the institutional responsibilities form was arguably ambiguous, there was sufficient evidence to show that Tao's responses on the form regarding conflicts of time commitment were false. Viewing the evidence in the light most

---

[6] Full-time faculty typically spend forty percent of their time on teaching obligations but may request to use funding from, for example, research grants or an endowment account to cover some or all of their teaching responsibilities for a semester.

favorable to the government, his activities related to Fuzhou University did take time away from his responsibilities with KU.

3. *The institutional responsibilities form was within the jurisdiction of the executive branch.*

Section 1001 protects "the authorized functions of governmental departments and agencies." *United States v. Rodgers*, 466 U.S. 475, 480 (1984) (quoting *United States v. Gilliland*, 312 U.S. 86, 93 (1941)). An agency has jurisdiction "when it has the power to exercise authority in a particular situation." *Id.* at 479. This authority pertains to the "official, authorized functions of an agency" and not to "matters peripheral to the business of that body." *Id.* For purposes of § 1001, however, agency jurisdiction is to be defined broadly and "should not be given a narrow or technical meaning." *Bryson v. United States*, 396 U.S. 64, 70 (1969). Even if a federal agency delegates primary authority to a state agency to discharge some of its duties, a "grant of primary authority is not a grant of exclusive authority." *United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993) (finding § 1001 jurisdiction where water treatment plant employee submitted results from unperformed water tests to a state agency that had received from the EPA primary responsibility for drinking water standards). When a federal agency acts as a supervisor of disbursement or reimbursement to a defrauded state agency, the federal government retains jurisdiction under § 1001 to enforce its regulations and ensure that "federal funds are properly spent." *Id*. at 1038–39.

The Eleventh Circuit has limited § 1001 jurisdiction by holding that although the government may prosecute individuals who are recipients of funds, the agency may not

exercise authority over third parties with whom the recipient interacts. *United States v. Blankenship*, 382 F.3d 1110, 1116–17, 1138 (11th Cir. 2004) (finding no jurisdiction when funds originating with the United States Department of Transportation and earmarked for a minimum target of woman or minority-owned and controlled enterprises (DBEs), passed through the Florida Department of Transportation and then through a private construction company that hired a DBE, only to have the DBE covertly hire a non-DBE [Blankenship] to perform the work and share in the proceeds). The Eleventh Circuit held that the jurisdiction of the United States Department of Transportation did not "follow federal money wherever it may lead," i.e., to third parties who interact with the recipient of federal funds even though the third party was knowingly involved in the scheme. *Id.* at 1138. To hold otherwise, the Eleventh Circuit concluded, would criminalize a shocking range of conduct: a false address on a library card application, a healthy teacher who reports a sick day, or a college applicant who submits false grades, or any other false statement by a third party to a recipient of federal funds. *Id.* at 1137–38.

The parties disagree as to whether *Blankenship* is distinguishable from the facts of this case and is on the whole advantageous to the government or to Tao. The district court correctly distinguished the facts in *Blankenship* from those here when it denied dismissal of the second superseding indictment. The district court stated as follows: "[Tao], as a KU employee, applied for and received DOE and NSF grants . . . . [T]he NSF required KU to maintain conflict policies, and conditioned its grant awards on applicants' compliance with those policies. [Tao] directly applied for NSF grants in 2014

17

and 2017, and DOE and NSF directly agreed to fund [Tao's] research." *United States v. Tao*, 499 F. Supp. 3d 940, 962 (D. Kan. 2020). The district court noted, in direct contrast to *Blankenship*, that "the DOE and NSF had direct authority to withhold grant funds from KU employees." *Id.* As the district court held, the agencies had substantial power to act and to exercise direct control over whether Tao received grant funds. Unlike the fact pattern in *Blankenship*, Tao and the funding agencies dealt directly with each other to achieve Tao's receipt of federal grants. That said, even if *Blankenship* could be read to apply to our facts, it is in conflict with Tenth Circuit case law. In *United States v. Wolf*, we found § 1001 jurisdiction was satisfied when the false statement was made between two private entities, neither of which received funds directly or indirectly from the government, and neither of which received non-monetary benefits from the government. 645 F.2d 23, 25 (10th Cir. 1981). The key to jurisdiction there was that the statement at issue was required by regulation. *Id.* at 24–26.

Accordingly, a false statement need not be made directly to a federal agency in order to fall within that agency's jurisdiction. *Id.* at 25–26; *see also United States v. Murphy*, 935 F.2d 899, 901 n.1 (7th Cir. 1991) (finding § 1001 jurisdiction where false statement made to Illinois Department of Public Aid was nonetheless "within the jurisdiction" of the United States Department of Health and Human Services (HHS) given HHS' regulatory oversight and provision of funding to the Illinois Aid to Families with Dependent Children program). Nor is the reach of § 1001 confined "to matters in which the Government has some financial or proprietary interest." *Rodgers*, 466 U.S. at 480 (quoting *Gilliland*, 312 U.S. at 91). Section 1001 jurisdiction even extends to false

18

information not required by statute or regulation.  *United States v. Meuli*, 8 F.3d 1481,

1485 (10th Cir. 1993).

It matters not then that Tao's institutional responsibilities form was not sent

directly to either the DOE or the NSF or that these agencies may never have seen the

form.  Regardless of whether the agencies saw the form itself, Dr. Keiser, the Chief of

Research Security, Strategy, and Policy for the NSF, testified that the NSF wanted

disclosure of affiliations, appointments, and sources of funding on applications for NSF

funding so that the NSF could trust the results of research and be good stewards of

taxpayer money.  She testified that the NSF's function as a research funder is significant

as ninety-three percent of the NSF's budget is disbursed to research organizations like

KU.  Dr. Keiser also said that research organizations must maintain and enforce policies

on conflicts of time or interest and that the NSF delegates responsibility for managing

conflicts of time or interest to the research organization.  Dr. Schwartz, a program

manager for the DOE, said that the DOE assesses whether researchers are overcommitted

with their time and that the DOE shares responsibility for reviewing conflicts of time or

interest with the university.  Finally, Ms. Reed also testified that by regulation, KU is

responsible for maintaining and enforcing policies on conflicts of time or interest, and she

specifically referenced 2 C.F.R. § 200.

Based on the testimony from these witnesses, information that is communicated in

the institutional responsibilities form falls within the DOE's and the NSF's authorized

functions, namely, the assurance that any conflicts of time commitment on the part of

researchers are managed by the recipient of grants and, if needed, presented to the DOE

19

and the NSF for review.  *See Rodgers*, 466 U.S. at 480.  Further, although the jurisdiction of § 1001 extends to information not required by statute or regulation, *Meuli*, 8 F.3d at 1485, the alleged false statement regarding Tao's conflicts of time commitment was also meant to respond to 2 C.F.R. § 200.112, a federal regulation that mandates the disclosure of such information and was cited by Ms. Reed in her testimony, *see* 2 C.F.R. § 200.112 ("The Federal awarding agency must establish conflict of interest policies for Federal awards. The non-Federal entity must disclose in writing any potential conflict of interest to the Federal awarding agency or pass-through entity in accordance with applicable Federal awarding agency policy.").  As previously stated, in *Wolf*, which found jurisdiction over a false statement between two private entities—neither of which received funds directly or indirectly from the government nor non-monetary benefits from the government, we held it was enough that the information was required by regulation.  645 F.2d at 25–26.  Here, the institutional responsibilities form falls under the jurisdiction of the executive branch,[7] not only because the information is required by regulation, but also because it provides oversight in the disbursement of federal grant funds.  *See id.*; *Rodgers*, 466 U.S. at 480.

*4.  Tao's statement was material.*

   A "false statement is material if it has a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was

_____

[7] Here, the jurisdictional nexus is even stronger than in *Wolf* because it rests not only on the regulation itself but also upon the direct disbursement of federal funds from the DOE and the NSF to KU.

addressed." *Irvin*, 682 F.3d at 1267 (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)). This determination requires an analysis as to (a) what statement was made, (b) what decision was the decision maker considering, and (c) whether the statement had a natural tendency to influence, or was capable of influencing, the relevant decision. *United States v. Gaudin*, 515 U.S. 506, 509, 512 (1995).[8] However, the statement need not actually influence the decision. *United States v. Stein*, 985 F.3d 1254, 1270 (10th Cir. 2021). "The pertinent inquiry is instead whether [the defendant's] representations had the *capability* to so influence the[] decision[]." *Irvin*, 682 F.3d at 1268.

When rejecting Tao's motion for acquittal on the § 1001 conviction, the district court addressed the three *Gaudin* questions to conclude that the government had presented sufficient evidence of materiality:

> It is true that NSF never sees a principal investigator's KU Institutional Responsibilities forms, and there is no evidence that had Tao disclosed his foreign activities to KU, KU would have disclosed this information to NSF. There is no evidence that NSF would have ever received Tao's statement. Yet, NSF required KU to ensure that any conflicts held by principal investigators are managed or disclosed to NSF in accordance with KU policy before the expenditure of grant funds. Tao's false certification prevented KU from fulfilling its responsibility to determine whether his affiliation with FZU presented a conflict of interest, and if so, what steps

---

[8] The majority attempts to raise the bar by reading *United States v. Christy*, 916 F.3d 184 (10th Cir. 2019), as requiring proof that Tao's false statement must be capable of influencing "that particular decision." Majority Op. at 10. But *Christy* tracks the language in *Gaudin* by asking only whether the false statement was "capable of influencing the relevant decision." *See* 916 F.3d at 854. The majority makes repeated references to its requirement that there must be grant proposals *pending* before the agencies, i.e., "actual funding decision[s]" capable of being influenced, before Tao's statement could be material. Majority Op. at 13. But this is more than *Gaudin* requires. *See* 515 U.S. at 509. It is enough if Tao's false statement had "a natural tendency to influence or [be] capable of influencing" an agency's funding decisions. *Gaudin*, 515 U.S. at 509 (citing *Kungys v. United States*, 485 U.S. 759, 770 (1988)).

needed to be taken to manage, reduce, or eliminate that conflict before the expenditure of NSF funds. This evidence was sufficient to allow the jury to find beyond a reasonable doubt that Tao's false statement had a natural tendency to influence NSF.

App. vol. 1, 233.

In *Kungys*, Justice Scalia described the standard for materiality as "whether the misrepresentation or concealment was *predictably* capable of affecting, i.e., had a natural tendency to affect, the official decision." 485 U.S. at 771. "[T]he phrase 'natural tendency' connotes qualities of the statement in question that transcend the immediate circumstances in which it is offered and inhere in the statement itself." *United States v. McBane*, 433 F.3d 344, 351 (3rd Cir. 2005). "[B]ecause the materiality standard is objective, whether the decisionmakers were influenced by the defendant's false statement is irrelevant." *Williams*, 934 F.3d at 1129 (citing *Irvin*, 682 F.3d at 1267–68) (internal quotations omitted). "A false statement can be material regardless of its influence on the decisionmaker and can also be material even if the decisionmaker had already arrived at her conclusion *before* the statement is made." *Id.* at 1130 (emphasis added) (citing *Williams*, 865 F.3d at 1316) (same).

The majority relies heavily on the fact that the DOE and the NSF received and funded Tao's grant proposals *before* he submitted his 2019 institutional responsibilities form on September 25, 2018. But to be material, Tao's false statement need not be seen, considered, or relied on by the agencies. As stated in *Williams*, a defendant's false statement satisfies materiality requirements if it is the type of information an agency would have wanted to know when making a decision. *Id.*

What information would the DOE and the NSF want to know when deciding whether to award research grants? The DOE and the NSF consider a variety of factors when deciding whether to award research grants. These factors include the researcher's affiliations, appointments, and sources of funding; whether the researcher is overcommitted in terms of time; and current and pending research activities. The agencies evaluate this information in funding decisions to be good stewards of taxpayer money and to ensure that the research results are trustworthy and have scientific merit.

Dr. Schwartz and Dr. Keiser provided testimony specifically outlining the type of information that had the capacity of influencing their decisions. For example, Dr. Schwartz testified that on a funding renewal application, the DOE wanted to know any current and pending research activities in order to determine whether Tao had sufficient time to perform the research that the DOE was funding. If Tao had insufficient time to perform DOE research, surely the DOE would want to know this information regardless of the timing. As further example, Dr. Keiser, speaking on behalf of the NSF, stated: "Something that's concerning to us is if we receive applications for this funding and there are conflicts there, there are things like affiliations, appointments, sources of funding that are not told to us. Then we're basing our decisions on inaccurate or incomplete information, and that isn't fair and it also results in funding research where we can't trust the results of the research." App. vol. 5, 960.

This testimony also shows that the NSF's need for trustworthy research is continuing and does not arise only when specific reports are due. Dr. Keiser even testified that the length and complexity of their grant policies are due to their intent to

provide as much detail about not only the proposals, but also "what needs to happen after we award the grant." *Id.* at 997–98. The majority unreasonably limits the scope of information that is material to an agency's decision only to information available *before* submission of a grant proposal. NSF also needs accurate information after a grant is awarded so it can take necessary steps to manage, reduce, or eliminate any conflicts that arise before NSF funds are expended.

Materiality then is not measured by whether the false statement was included in a pre-planned submission, such as an initial grant application or renewal proposal. If information had the capacity to affect an agency's decision, the information became no less material *after* grants were awarded. The institutional responsibilities form that Tao certified as "true, correct, and complete" also required Tao to "report any changes" to the form "as soon as they become known to [him] . . . ." App. vol. 12, 2732. Tao's statement, which lacked any reference to his "external . . . professional activities," *id.* at 2684, omitted information that the DOE and the NSF would have wanted to know, i.e., information that had the capacity to influence funding decisions.

The majority is also preoccupied with whether the agencies had written conflicts of time or interest policies. Indeed, the majority would disregard much of the testimony that the jury heard from DOE and NSF witnesses regarding information that was material to these agencies. For example, the majority, in a footnote, voices that if Tao had a disclosable time commitment but not a disclosable financial interest, such information could not have been material to the NSF because the NSF did not have a written policy on disclosure of time commitments specifically. This conclusion is rebutted by looking

24

at the NSF's written policy, the PAPPG,[9] and to the testimony of Dr. Keiser regarding the PAPPG. When asked about NSF requirements on "conflicts of interest," Dr. Keiser gave "other sources of employment" as an example of a potential conflict of interest. App. vol. 5, 982. She went on to say that the NSF takes the failure to identify or resolve conflicts of interests seriously and, in some cases, will refer the matter for investigation by their Office of Inspector General, which may recommend potential action against the principal investigator or the research organization. Dr. Keiser also discussed the NSF's requirement to report paid or unpaid research support that is active or for which the principal investigator has a pending application. When asked why the NSF wanted this information, she said they were looking for a "capacity issue," including "time and intellectual capacity." *Id.* at 988. Then, when asked about "changes in the objectives or scope," Dr. Keiser read from the PAPPG that "objectives or scope of the project may not be changed without prior NSF approval." *Id.* at 996. She stated that examples of such changes include if the "principal investigator wants to . . . take some time off from the NSF grant" or if the university needs to change the principal investigator because "the first one left the university or doesn't have time to do the grant anymore." *Id.* at 996–97. This testimony supports the conclusion that the NSF, via the PAPPG and the expectations communicated by Dr. Keiser in her testimony, considers a principal investigator's time

---

[9] *See* App. vol. 14, 3001 ("The proposed project and all other projects or activities requiring a portion of time of the PI [principal investigator] and any other senior personnel must be included, even if they receive no salary support from the project(s). The total amount for the entire award period covered (including indirect costs) must be shown as well as the number of person-months per year to be devoted to the project, regardless of source of support.").

commitments to be material, whether reportable during regularly scheduled reports, or after the grant is awarded.

As for the DOE, it is not obvious why the district court did not reach a conclusion on whether the false statement was material to the DOE. Perhaps the district court saw no need to address materiality as it pertains to the DOE given its NSF ruling, especially when both agencies are referenced in the same count of the indictment. Nonetheless, Dr. Schwartz asserted that the DOE was concerned with any current or pending research activities because it wanted to determine whether researchers had sufficient time to perform the research. Dr. Schwartz did limit this statement by saying that it was the university's responsibility to ensure an employee was dedicated to their job and dedicating the expected time. Regardless, it is clear from Dr. Schwartz's testimony that even absent a written policy, the DOE was concerned with Tao's current and potential time commitments and would want to be informed when a conflict arises. As with the NSF, therefore, I would conclude that Tao's time commitments were material to the DOE.

In terms of the time that Tao devoted to Fuzhou University, he made equipment purchase proposals and lab set-up schedules, signed student advisor selection forms, circulated job postings for support staff and made job offers and other recruiting efforts, admonished a candidate for turning down a job offer, and used a taofeng@fzu.edu.cn email address to discuss potential lab equipment. Tao also obtained a buyout of his teaching responsibilities at KU, thereby acknowledging his outside activities directly affected his time commitments. And, as noted by the majority, Tao had the potential

conflict of time or interest of a five-year, full-time appointment as a professor at Fuzhou University. This is all information about Tao's conflicts of time commitment that was material to both the DOE and the NSF as all of this information has the capacity of influencing the agencies' decisions.

In sum, I would conclude the materiality element of § 1001 is satisfied. In response to the three-step analysis set forth in *Gaudin*: 1) the statement at issue is the institutional responsibilities form; 2) the decisions the DOE and the NSF were attempting to make were whether to fund or to continue to fund Tao's research; and 3) the answer to whether information conveyed by Tao's institutional responsibilities form was capable of influencing the agencies' decisions is yes. *See* 515 U.S. at 512.

Finally, I address the majority's discussion of § 200.112 as it pertains to materiality. This court has previously determined that if a statement is a basic part of a regulatory structure that depends on the accuracy and truth of the statement, then the statement is within the agency's jurisdiction and is material to that agency. *Wolf*, 645 F.2d at 25–26. The majority accurately states that the jury never saw this regulation. However, the regulation and its significance were described to the jury through witness testimony. As KU's Assistant Vice Chancellor of Research, Ms. Reed, testified:

> Q. And how does this -- how does the conflict of office -- excuse me, the conflict of interest policy relate to the work that the Office of Research does?
> A. Right. So under federal regulations, again I mentioned 2 C.F.R. 200, it's called the uniform guidance, and it requires us to have policies and controls in place to ensure that the funding that we are receiving from the federal government is treated appropriately, that we are -- that it's separate and that there's not any apparent conflict of interest. And so this policy helps us

27

make sure that we are -- that we can propose and accept from -- funding
from federal agencies.
Q. And is that true of all federal agencies, that KU is required to have this
policy?
A. There is an expectation that we have some type of controls around
conflict of interest, yes.

App. vol. 2, 408–09.[10]  When discussing this regulation, the majority doubles

down on its preoccupation with written policies in order to avoid the binding

precedent set forth in *Wolf*.  Our ruling in *Wolf* supports our concluding the

materiality element is satisfied because the institutional responsibilities form was a

basic part of a regulatory structure that depends on the accuracy and truth of the

form.

IV

*1.  Due Process*

Tao argues that this court should reverse his conviction because § 1001(a)(2) is so

vague that it violates the fair warning requirement of the Due Process Clause.  As part of

this argument, Tao asserts that "the rule of lenity" and "the bar" on applying novel

constructions of criminal statutes bar his conviction.

The right to due process includes a fair warning requirement that is based on the

principle that no person shall be held criminally responsible for conduct that the person

could not reasonably understand to be criminal.  *United States v. Lanier*, 520 U.S. 259,

---

[10] The jury could rely on this testimony from Ms. Reed when responding to the
jury instruction on the false statement counts, which simply required the jury to be
convinced that the government proved that the false statement was material to the DOE
or the NSF, or that it had a "natural tendency to influence or [wa]s capable of influencing
a decision of the federal agency."  App. vol. 1, 144.

265 (1997).  The three "manifestations" of the fair warning requirement are the

following: (1) a vagueness doctrine that "bars enforcement of 'a statute which either

forbids or requires the doing of an act in terms so vague that men of common intelligence

must necessarily guess at its meaning and differ as to its application,'" (2) a rule of lenity

that "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it

only to conduct clearly covered," and (3) a bar on "applying a novel construction of a

criminal statute to conduct that neither the statute nor any prior judicial decision has

fairly disclosed to be within its scope."  *Id.* at 266–67 (collecting cases).  In all three of

these circumstances, "the touchstone is whether the statute, either standing alone or as

construed, made it reasonably clear at the relevant time that the defendant's conduct was

criminal."  *Id.* at 267.

In some contexts, the government must prove that a criminal defendant knew the

actions were illegal.  *United States v. Wenger*, 427 F.3d 840, 851 (10th Cir. 2005) (citing

*Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).  In other contexts, especially those in

which the conduct is *malum in se*, a willful act could include intentional conduct that the

defendant simply knew to be wrongful.  *Id.* at 851–52.  In either case, willful criminal

conduct includes, at minimum, conduct that "no ordinary person would engage in

innocently."  *Id.* at 852 (quoting *Ratzlaf*, 510 U.S. at 660–61) (quotation omitted).

Finally, "where the punishment imposed is only for an act knowingly done with the

purpose of doing that which the statute prohibits, the accused cannot be said to suffer

from lack of warning or knowledge that the act which [the person] does is a violation of

law."  *Id.* (quoting *Screws v. United States*, 325 U.S. 91, 102 (1945)).

As an initial matter, Tao provides no argument supporting his contention that failure to reverse his conviction would invite arbitrary enforcement. *See* Aplt. Br. at 38, 40. Because this assertion lacks meaningful development, I will not address it. *See United States v. Hall*, 473 F.3d 1295, 1313 n.5 (10th Cir. 2007).

As to Tao's vagueness challenge, I begin by noting that Tao was aware of many other scientists who faced criminal investigation and charges regarding their handling of research grants and research relationships with other countries. App. vol. 10, 2041 (Tao forwarding an email to his wife that reported on NSF grant fraud); App. vol. 9, 1816–17, vol. 15, 3336–37 (Tao discussing an employee of the U.S. Oceanic Administration whom the FBI "went to the court in private . . . to sentence" for not disclosing research appointments in China); App. vol. 9, 1816–17, vol. 15, 3337–38 (Tao discussing a former Michigan State employee who "completely transferred over" to a chair professorship at Hong Kong University and profited from submitting expense reimbursements to the NSF); App. vol. 9, 1816–17, vol. 15, 3339 (Tao discussing a Temple University professor accused by the FBI of "bringing back" classified technology to China); App. vol. 15, 3340 (Tao stating that he suspected scientists, especially those that are not U.S. citizens, are monitored for espionage). Tao does, however, in most of these instances, distinguish the conduct of other scientists as more severe than his own.

It is also evident that the four cases cited by the government—to support its argument that Tao's conviction is not a novel construction of § 1001—correspond to indictments that post-date Tao's conduct. *See United States v. Zheng*, 27 F.4th 1239, 1242 (6th Cir. 2022); *United States v. Lookman*, 19-1439, Indictment (D.N.M. May 22,

2019); *United States v. Ang*, 20-50029-001, Indictment (W.D. Ark. July 28, 2021); *United States v. Lu*, 20-234, Indictment (W.D. Okla. Feb. 18, 2021). Regardless of the dates of the indictments in the proceedings cited by the government, Tao unquestionably knew that for scientists receiving government funding, there was a line between innocent and criminal conduct. He also knew of several instances where that line had been crossed.

As discussed above, there was sufficient evidence to conclude that Tao made a false statement on his institutional responsibilities form. The key question here, however, is whether § 1001 "made it reasonably clear at the relevant time that the defendant's conduct was *criminal*." *Lanier*, 520 U.S. at 267 (emphasis added). Again, "where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which [they do] is a violation of law." *Wenger*, 427 F.3d at 852 (citing *Screws*, 325 U.S. at 102). The "knowingly and willfully" element of a false statement was the one element that Tao does not dispute on appeal. Without the assertion that Tao did not act knowingly, Tao's argument that his conviction violates the fair warning requirement of due process cannot succeed. *See id.*

## 2. The Paperwork Reduction Act

Tao argues that even if the institutional responsibilities form was within the jurisdiction of the DOE or the NSF, the Paperwork Reduction Act (PRA) bars Tao's conviction because the institutional responsibilities form did not display a valid Office of Management and Budget (OMB) control number indicating OMB approval of the form.

31

The government responds in opposition that Tao waived this argument, that this argument would fail under plain error review, and regardless, that the PRA does not protect individuals against prosecution for making false statements on government forms. In reply, Tao states that he did preserve this issue; that nevertheless, the PRA can be raised at any time during a judicial action; and that the form Tao completed was not a government form.

Before the district court, Tao proposed a jury instruction on the PRA, to which the government objected.  The district court sustained the government's objection, explaining that Tao should have raised the PRA argument in "a motion to dismiss or otherwise" and that the district court was not provided with any case law to support giving the proposed instruction.  App. vol. 12, 2501.  Tao further defended the jury instruction, arguing that the PRA statute permits a PRA argument to be raised at any time, similar to a jurisdictional argument.  Tao also argued that the district court had previously made clear at the indictment stage that the district court was unwilling, at the motion to dismiss stage, to look beyond the four corners of the indictment, e.g., to the institutional responsibilities form and its lack of proper OMB language.  The district court held firm in sustaining the government's objection and instructed Tao to raise the issue in a post-trial motion, which he failed to do.

Under the PRA, "collection of information" includes "the disclosure to third parties . . . of facts or opinions . . . for an agency, regardless of form or format, calling for either . . . answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons . . . ."  44 U.S.C. § 3502(3)(A)(i).  "[E]ach

agency shall . . . ensure that each information collection . . . informs the person receiving

the collection of information of . . . the fact that an agency may not conduct or sponsor,

and a person is not required to respond to, a collection of information unless it displays a

valid control number . . . ." 44 U.S.C. § 3506(c)(1)(B)(iii)(V). To sponsor the collection

of information, an agency shall undergo an established review process, evaluate public

comments, publish a notice in the Federal Register, and receive approval and a control

number from the Director of the OMB. *Id.* § 3507(a). The section of the PRA most

relevant to Tao's arguments is the following:

> (a) Notwithstanding any other provision of law, no person shall be subject
> to any penalty for failing to comply with a collection of information that is
> subject to this subchapter if--
>> (1) the collection of information does not display a valid control
>> number assigned by the Director in accordance with this subchapter;
>> or
>> (2) the agency fails to inform the person who is to respond to the
>> collection of information that such person is not required to respond
>> to the collection of information unless it displays a valid control
>> number.
> (b) The protection provided by this section may be raised in the form of a
> complete defense, bar, or otherwise at any time during the agency
> administrative process or judicial action applicable thereto.

*Id.* § 3512. The PRA defines penalty to include "the imposition by an agency or court of

a fine or other punishment." *Springer v. Comm'r of Internal Revenue*, 580 F.3d 1142,

1146 (10th Cir. 2009) (quoting 44 U.S.C. § 3502(14)).

Other circuit courts have found that the PRA requires courts to entertain

arguments that would otherwise have been barred by the proponent's failure to make the

argument at an earlier stage in the judicial process. *See Mobilfone Serv., Inc. v. F.C.C.*,

79 F. App'x 445, 446–47 (D.C. Cir. 2003); *United States v. Lee*, 967 F.2d 594 (Table), *2

(9th Cir. 1992). In the Tenth Circuit, whether a PRA argument can be raised for the first time on appeal is an issue of first impression. Even though Tao did not raise his PRA argument in his post-trial motion, I will consider it here and determine that it nonetheless fails. The "PRA protects a person only 'for *failing* to file information. It does not protect one who files information which is false.'" *United States v. Chisum*, 502 F.3d 1237, 1243–44 (10th Cir. 2007) (quoting *United States v. Collins*, 920 F.2d 619, 630 n.13 (10th Cir. 1990)). If a criminal defendant files false information, "whether the forms contained current OMB numbers is irrelevant." *United States v. Sasser*, 974 F.2d 1544, 1555 (10th Cir. 1992). As described above, "[l]eaving a blank is equivalent to an answer of 'none' or a statement that there are no facts required to be reported." *Irwin*, 654 F.2d at 676 (quoting *McCarthy*, 422 F.2d at 162), abrogated on other grounds by *Daily*, 921 F.2d at 1004. Moreover, as I conclude above, the evidence was sufficient to conclude that Tao made a false statement regarding his conflict of time commitment. Given these facts, Tao's conviction is not barred by the PRA.

3. *Tao's Arguments for a New Trial*

As previously stated, this court reviews a "district court's denial of a Rule 33 motion for abuse of discretion, reversing only if the court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances." *Dewberry*, 790 F.3d at 1028 (quoting *Zabriskie*, 415 F.3d at 1144).

a. *There was no fatal variance in the indictment.*

Tao argues that there were fatal variances in the indictment. Whether a variance existed and whether it was fatal such that relief is required are questions of law that this

34

court reviews de novo. *United States v. Williamson*, 53 F.3d 1500, 1512 (10th Cir. 1995).

"A variance occurs when the proof introduced at trial differs materially from the facts

alleged in the indictment." *United States v. Moore*, 198 F.3d 793, 795 (10th Cir. 1999)

(quoting *United States v. Beeler*, 587 F.2d 340, 342 (6th Cir. 1978)); *see also Williamson*,

53 F.3d at 1512–13. An amendment to the indictment, on the other hand, sometimes

referred to as a fatal variance, "involves a change, whether literal or in effect, in the terms

of the indictment." *Moore*, 198 F.3d at 795 (quoting *Beeler*, 587 F.2d at 342);

*Williamson*, 53 F.3d at 1513. "An indictment is constructively amended if the evidence

presented at trial, together with the jury instructions, raises the possibility that the

defendant was convicted of an offense other than that charged in the indictment." *Hunter*

*v. New Mexico*, 916 F.2d 595, 599 (10th Cir. 1990) (quoting *United States v. Apodaca*,

843 F.2d 421, 428 (10th Cir. 1988)); *see also United States v. Koerber*, 10 F.4th 1083,

1115–16 (10th Cir. 2021).

      This court applies a harmless error analysis to a simple variance. *United States v.*

*Failing*, 96 F. App'x 649, 653 (10th Cir. 2004); *see also Hunter*, 916 F.2d at 599

(determining that "convictions generally have been sustained as long as the proof upon

which they are based corresponds to an offense that was clearly set out in the

indictment") (quoting *United States v. Miller*, 471 U.S. 130, 136, (1985)). Fatal

variances, in comparison, are reversible per se, *Koerber*, 10 F.4th at 1115–16, because as

a matter of constitutional law, a court may not "permit a defendant to be tried on charges

that are not made in the indictment," *Hunter*, 916 F.2d at 598 (quoting *Stirone v.*

*United States*, 361 U.S. 212, 217 (1960)).

Tao supports his assertion that there was a fatal variance by arguing he may have been convicted for (1) causing KU to make a false statement to the government as opposed to making a false statement to the government himself, or (2) making a false statement in the certification portion of the institutional responsibilities form rather than the disclosure section.  Even if one or more of these scenarios is the factual basis upon which his conviction was based, this is not a fatal variance.  The government charged Tao under both 18 U.S.C. § 1001, making a false statement, and 18 U.S.C. § 2, aiding and abetting, in Count Nine of the Second Superseding Indictment.  Count Nine also listed the institutional responsibilities form as the "description of the false statement," and the certification portion of the institutional responsibilities form is a *section* of the form, not a separate statement.  App. vol. 12, 2725–2732.  As such, there is no fatal variance that would result in a reversal per se.[11]  The district court did not abuse its discretion, and I would, therefore, deny Tao's request for remand for a new trial on the basis of a fatal variance.

### b.  *The district court did not err when it did not instruct the jury on two of Tao's defenses.*

Tao also argues that if this court does not reverse his conviction, it should vacate the judgment of conviction and remand for a new trial because the district court failed to inform the jury of two of his proposed defenses: (1) that the PRA was a complete bar to his conviction, and (2) that the institutional responsibilities form was ambiguous.

---

[11] Tao does not assert that a simple variance occurred.

"While we review a district court's refusal to give a particular jury instruction for abuse of discretion, the ultimate standard of review is de novo, to determine whether the instructions as a whole accurately informed the jury of the issues and the governing law." *United States v. Westover*, 107 F. App'x 840, 843 (10th Cir. 2004) (citing *United States v. McPhilomy*, 270 F.3d 1302, 1310 (10th Cir. 2001)).  An instruction on a theory of defense is not required if it would "simply give the jury a clearer understanding of the issues." *United States v. Williams*, 403 F.3d 1188, 1195 (10th Cir. 2005) (quoting *United States v. Wolny*, 133 F.3d 758, 765 (10th Cir. 1998)).  The theory must be "supported by some evidence and the law," *United States v. Alcorn*, 329 F.3d 759, 767 (10th Cir. 2003) (quoting *United States v. Haney*, 318 F.3d 1161, 1163 (10th Cir. 2003)), and the instruction is only required if its absence would render the district court's instructions "erroneous or inadequate," *id.* (quoting *Wolny*, 133 F.3d at 765).

Tao's requested jury instruction on the PRA was an incorrect statement of the law. As previously stated, the "PRA protects a person only 'for *failing* to file information. It does not protect one who files information which is false.'" *Chisum*, 502 F.3d at 1243–44 (quoting *Collins*, 920 F.2d at 630 n.13).  Because the instruction would have been an incorrect statement of the law, the district court did not err when it chose not to provide the jury with the instruction.  *See United States v. Bowling*, 619 F.3d 1175, 1182 (10th Cir. 2010).

As for Tao's argument that the district court should have instructed the jury that the institutional responsibilities form was ambiguous, Tao is incorrect.  "[W]here the *evidence* supports a defendant's position, the jury must be instructed concerning

37

reasonable interpretations of ambiguous requirements and the government's ensuing burden." *Migliaccio*, 34 F.3d at 1525 (emphasis added). In cases arising under § 1001, "the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous." *Id.* Critically lacking here is evidence of how Tao *correctly* interpreted the form when he submitted it. *See United States v. Lawrence*, 405 F.3d 888, 899 (10th Cir. 2005) (determining that the district court did not err in providing a jury instruction because there was no evidence to support the defendant's theory). Given this gap in Tao's evidence, the district court's denial of this jury instruction was not erroneous or inadequate. *See Haney*, 318 F.3d at 1163. Because the district court did not abuse its discretion, I would deny Tao's request for remand for a new trial on this basis.

V

In sum, I respectfully dissent. I would conclude that Tao's failure to disclose his conflict of time commitment related to his potential position at Fuzhou University was material to the DOE and the NSF. I further conclude that Tao's additional arguments in support of reversing his conviction or remanding for a new trial cannot succeed and, as such, would affirm Tao's conviction.